**UNITED STATES of America ex rel.,**
**Sheila HOPPER, Plaintiff–**
**Appellant,**

v.

**William ANTON; Los Angeles Unified School District; Leonard Britton; Paul Carr; Phillip Callison; James Esterle; Deanne Neiman; Benita Chaum; Carol Albright; Jackie Thompson, Defendants–Appellees.**

**UNITED STATES of America ex rel.,**
**Sheila HOPPER, Plaintiff–**
**Appellee,**

v.

**William ANTON; Leonard Britton; Paul Carr; Phillip Callison; James Esterle; Deanne Neiman; Benita Chaum; Carol Albright, Defendants,**

and

**Jackie Thompson; Los Angeles Unified School District, Defendants–Appellants.**

Nos. 95–55273, 95–55374.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 3, 1996.

Decided July 31, 1996.

James H. Fosbinder, and Rhonda M. Fosbinder, Fosbinder & Fosbinder, Venice, California, for plaintiff-appellant.

Bonifacio B. Garcia and Alex M. Moisa, Barbosa, Garcia & Barnes, Los Angeles, California, for defendants-appellees.

Before FARRIS, FERNANDEZ and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

Sheila Hopper ("Hopper") appeals the district court's entry of summary judgment against her *qui tam* False Claims Act ("FCA" or "Act") claim against the Los Angeles Unified School District ("LAUSD" or "School District"). The School District cross-appeals the district court's refusal to enter judgment as a matter of law after trial on Hopper's FCA employment retaliation claim under 31 U.S.C. § 3730(h).

We **AFFIRM** the grant of summary judgment and **REVERSE** the denial of the

School District's motion for judgment as a matter of law after trial.

## I. BACKGROUND

Hopper has been employed by the School District as a special education teacher for more than 20 years. Beginning in April of 1989, Hopper began complaining to her superiors that the School District was failing to comply with federal and state laws regarding the handling of special education children. Specifically, she alleged that the School District conducted Individualized Education Program ("IEP") evaluations [1] of potential special education students with special education teachers rather than the students' classroom teachers. She contended this procedure violated California Education Code § 56341(b)(2) [2] and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* (1994).[3]

Finding her superiors unrepentant, she reported the matter to the California State Department of Education ("CDOE") on May 15, 1989. The CDOE issued a compliance report on July 14, 1989 agreeing with Hopper that the School District was failing to comply with the California Education Code. When the School District continued to exclude classroom teachers from IEP evaluations,[4] Hopper renewed her complaint to the CDOE in December 1989 and January 1990. On February 16, 1990, the CDOE again found the School District out of compliance with § 56341.[5] The CDOE warned that continued failure to comply could result in a recovery of state funds from or a curtailment of state funds to the School District. The CDOE and

---

1. An IEP evaluation is a meeting to develop, review, or revise the individualized education program of an individual student with special needs. Cal. Educ.Code § 56341(a) (West 1989); 20 U.S.C. § 1401(a)(1994).

2. The Code requires the student's classroom teacher to be present at the IEP meeting. Cal. Educ.Code § 56341(b)(2) (West 1989). However, if that teacher is unavailable, a special education teacher qualified to teach the student may substitute. *Id.*

3. Hopper also alleged violations of § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (1994), and 34 C.F.R. § 100 *et seq.* (1994), the regulations implementing the IDEA.

4. LAUSD considered its classroom teachers "unavailable" for IEP evaluations and continued to substitute special education teachers for classroom teachers at the evaluations, believing this to be permissible under the law.

5. The CDOE interpreted § 56341(b)(2) to require classroom teachers to be present at IEP evaluations unless they are unavailable due to illness or other problem. That section does not permit a school district as a matter of policy to consider its classroom teachers "unavailable," allowing routine substitution of special education teachers for classroom teachers at IEP evaluations, as LAUSD had believed.

the School District engaged in negotiations over the course of the next two years to solve the problem. During this period, Hopper continued reporting to the CDOE that classroom teachers were not permitted to attend IEP evaluations, filing complaints in November 1990 and February 1991. On January 14, 1992, the CDOE again found the School District out of compliance.

Hopper filed a discrimination complaint with the U.S. Department of Education Office for Civil Rights on January 21, 1990, contending that special education students were not being serviced. On June 15, 1990, the agency found that the School District was in violation of federal law because of its delay in placing students eligible for special education into qualified programs. It also found that the School District had not harassed or retaliated against Hopper because of her complaints of LAUSD's noncompliance, as Hopper had alleged.

In March of 1990, a parent of one of Hopper's students complained to Jackie Thompson, principal of Nestle Elementary School, that Hopper had pushed and hurt his son. Thompson notified the police, as she is required to do under California Penal Code § 11166. The police determined that no crime had been committed. However, based in part on reports by Hopper's teaching assistant Olivia Ruiz and other students, Thompson concluded that Hopper had used impermissible corporal punishment in her classroom.

At approximately the same time, Thompson learned that a student was coming late to school on a regular basis without Thompson's knowledge or permission. The student's mother had met with the classroom teacher and Hopper. The three agreed it would be in the student's best interest for the student to come to school late. The mother felt she had received permission to bring her son late to school, and she began to do so.

Hopper contended she did not give the parent such permission. Thompson held Hopper and the classroom teacher responsible and recommended that both teachers be given written reprimands. The charges against Hopper included permitting a student to arrive late to school without proper authority and using improper corporal punishment inside and outside her classroom. Thompson's superiors felt more severe discipline was warranted and decided to suspend Hopper for 15 days.[6]

Hopper filed her first amended complaint in the district court on October 15, 1993, asserting two causes of action: one under the *qui tam* provisions of the FCA and another under § 3730(h) of the FCA for retaliation in employment for FCA-protected activity. For her *qui tam* action, Hopper alleged that the School District conducted evaluations of potential special education students without classroom teachers in violation of California Education Code § 56341(b)(2) and 34 C.F.R. § 300.344(a) and prolonged the evaluation process to avoid placing eligible students into special education classes in violation of state and federal law. Hopper argued these violations of state and federal law entitled her to bring a *qui tam* action under the FCA for recovery of IDEA funds provided to the School District. For her claim under § 3730(h), Hopper alleged LAUSD, Thompson, and others retaliated against her in several ways, including filing false child abuse charges against her, suspending her for 15 days, encouraging the filing of false assault charges against her by her assistant, failing to transfer her to an opening as full-time teacher at one school and maintaining her in two part-time positions at two schools.

The parties jointly moved for a continuance to permit additional discovery, but the district court denied the motion. LAUSD then moved for summary judgment on both causes of action. Hopper argued for additional discovery before a ruling on the motion. The district court refused the request and granted the School District's motion for summary judgment on Hopper's *qui tam* action, holding that a violation of law or regulations without a false statement is not sufficient to support a cause of action under the FCA. The court denied summary judgment as to the § 3730(h) retaliation claim.

---

6. Hopper never served the suspension. The teacher's union took the matter to arbitration on Hopper's behalf, and the arbitrator held that LAUSD had failed to prove any of the charges.

A jury trial ensued, resulting in a special verdict that Thompson had retaliated against Hopper for FCA-protected activity but that all other defendants were innocent of any wrongdoing. The School District moved for judgment as a matter of law after trial on the § 3730(h) claim, arguing that no reasonable jury could conclude that Thompson retaliated against Hopper or that Hopper was engaged in FCA protected activity. The district court denied the motion. Hopper timely appealed the order granting summary judgment against her *qui tam* action, and LAUSD timely cross-appealed the district court's refusal to enter judgment as a matter of law on the § 3730(h) claim. Hopper also contends on appeal that the district court erred in refusing to permit her additional discovery before ruling on the summary judgment motion.

## II. SUMMARY JUDGMENT ON THE FALSE CLAIMS ACT CLAIM

### A. OVERVIEW

■ We review a district court's grant of summary judgment *de novo*. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). We must "determine whether the evidence, viewed in a light most favorable to the non-moving party, presents any genuine issues of material fact and whether the district court [properly] applied the law." *Id.*

Hopper contends that the School District submitted false claims actionable under the FCA by (1) annually submitting reports to CDOE reconciling actual enrollment with the School District's predicted enrollment; (2) cashing checks received from CDOE for special education, a portion of which was derived from federal funding; and (3) submitting a triennial certificate to CDOE certifying that LAUSD "will meet all applicable requirements of state and federal law and regulations," including "general compliance" with the IDEA.

### B. CLAIM OF REGULATORY VIOLATIONS

Hopper's first two contentions originate from her assertion that LAUSD's regulatory violations create a viable cause of action under the FCA. Hopper contends that the School District committed actionable fraud against the government by annually submitting "J–50" and "J–380" forms to the CDOE indicating the number of special education students in the district. Hopper argues that because the School District was not in regulatory compliance, submission of these forms constitutes an actionable false claim. She also contends that by cashing checks received from CDOE, LAUSD was committing actionable fraud because the School District was not in compliance with IDEA regulations.

In granting summary judgment, the district court found that Hopper had not met the FCA's scienter and false claim requirements, stating:

It appears to the court that the plaintiff is operating under a fundamental misconception as to the reach and scope of the FCA. It is not the case that any breach of contract, or violation of regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA. Plaintiff assumes that if Los Angeles Unified School District (LAUSD) has violated regulations or law governing the Individuals with Disabilities Education Act (IDEA), it is automatically subject to suit under FCA. The FCA is far narrower. It requires a false claim. Thus, some request for payment containing falsities made with scienter (i.e., with knowledge of the falsity and with intent to deceive) must exist. This does not mean that other types of violations of regulations, or contracts, or conditions set for the receipt of moneys, or of other federal laws and regulations are not remediable; it merely means that such are not remediable under the FCA or the citizen's suit provisions contained therein.

■ We agree with the district court's analysis of plaintiff's claims. The FCA was enacted during the Civil War with the purpose of forfending widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to

the government. *U.S. v. Rivera,* 55 F.3d 703, 709 (1st Cir.1995). In furthering this goal, the Act attaches liability, not to underlying fraudulent activity, but to the "claim for payment." *Id.* What constitutes the FCA offense is the knowing presentation of a claim that is either fraudulent or simply false. *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991).

■ The archetypal *qui tam* [7] FCA action is filed by an insider at a private company who discovers his employer has overcharged under a government contract. *See, e.g., United States ex rel. Green v. Northrop Corp.,* 59 F.3d 953 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2550, 135 L.Ed.2d 1069 (1996). However, FCA actions have also been sustained under theories of supplying substandard products or services (*see, e.g., United States v. Aerodex,* 469 F.2d 1003 (5th Cir.1972)); false negotiation, including bid rigging and defective pricing (*see, e.g., United States v. Ehrlich,* 643 F.2d 634 (9th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981)); and false certification (*see, e.g., United States v. Hibbs,* 568 F.2d 347 (3d Cir.1977)). Hopper claims FCA liability as a result of false certification of compliance with federal law.

John T. Boese explained the theory of false certification in his text on the False Claims Act:

> False certification cases differ from mischarging and false negotiation cases. In these cases, parties avail themselves of benefits of some type, such as loan guarantees or agricultural supports, through false statements which create eligibility that otherwise would not exist. Two major questions relating to liability in these cases are: (1) whether the false statement is the cause of the Government's providing the benefit; and (2) whether any relation exists between the subject matter of the false statement and the event triggering Government's loss.

John T. Boese, *Civil False Claims and Qui Tam Actions* 1–29 to 1–30 (1995).

■ In this instance, the School District did not make a certification which could constitute a "false claim" under the Act, much less a false statement which caused the United States to provide an improper benefit. A brief review of the federal government's mechanism for funding special education illustrates this. Each year, the federal government allocates IDEA funds to California and other states for special education programs to ensure a free appropriate public education for children with disabilities. 20 U.S.C. § 1400(c) (1994). Federal money for special education is assigned to the states on a per-student basis. 20 U.S.C. § 1411(a) (1994). However, California apportions the money among its school districts based upon other information, including the number of special education personnel and other factors, rather than on solely a per-student basis. This information is listed in the J–50 form every district must submit to the CDOE four times a year. At the end of the year, each district submits to the CDOE a form J–380 either to request reimbursement for money spent in excess of budget or to pay back excess money received to which it is not entitled.

As the district court observed, Hopper misinterprets the breadth of the Act. Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit. *See United States ex rel. Fallon v. Accudyne Corp.,* 880 F.Supp. 636, 638 (W.D.Wis. 1995) (false certification of compliance with

---

**7.** Under the FCA, a private individual is empowered to bring an action on behalf of the U.S. government (termed a *"qui tam"* action) against any individual or company who has knowingly presented such a false or fraudulent claim to the U.S. government. *United States ex rel. Anderson v. Northern Telecom,* 52 F.3d 810, 812–13 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996). If the plaintiff succeeds in her *qui tam* suit, she shares the judgment with the government as a bounty. 31 U.S.C. § 3730(d) (1994). The purpose of the *qui tam* provisions of the FCA is to encourage private individuals who are aware of fraud being perpetrated against the government to disclose that information. *United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 742 (9th Cir.1995) (en banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996).

environmental laws states FCA claim); *X Corp. v. Doe*, 816 F.Supp. 1086, 1093 (E.D.Va.1993) ("The heart of fraud is an intentional misrepresentation. A violation of a regulatory provision, in the absence of a knowingly false or misleading representation, does not amount to fraud."). In the J–50 and J–380 forms, the School District made no such false certification. The forms do not contain any certification concerning regulatory compliance. In fact, the IDEA does not require funding recipients to certify their compliance with federal laws and regulations.

Hopper also argues that the School District has made an actionable false claim by accepting federal funds when it was not in compliance with IDEA. This contention suffers from the same fatal defect: lack of a false claim. Mere regulatory violations do not give rise to a viable FCA action. This is particularly true here where regulatory compliance was not a *sine qua non* of receipt of state funding. There are administrative and other remedies for regulatory violations. Hopper knows this. She has pursued many of them. However, absent actionable false certifications upon which funding is conditioned, the False Claims Act does not provide such a remedy.

## C. CLAIM OF PROMISSORY FRAUD

■ Hopper next argues that the School District's submission of a triennial certification, containing general assurances that the School District will generally comply with applicable federal law, is an actionable false certification under the Act. Every three years, each California school district must prepare a "Local Plan" to submit to the CDOE. The Local Plan is an agreement between the school district and the district's community detailing how the district is going to implement its special education programs. This Local Plan includes the Certification of Participation, Compatibility, and Compliance Assurances ("Certification of Assurances"), which the district superintendent signs to indicate that a district will operate its special education programs in a manner consistent with both state and federal law. The affected school district certifies:

that the agency(ies) herein represented will meet all applicable requirements of state and federal laws and regulations, including general compliance with Public Law 94–142, Section 504 of Public Law 93–112 and the provisions of the California Education Code, Part 30.

Every three years, the CDOE conducts a comprehensive review of school districts' special education programs and outlines problem areas. If the review reveals areas of noncompliance with law or regulation, a school district must propose a solution to the problem acceptable to the CDOE.

However, this Certification of Assurances is *not* a prerequisite for the School District to receive annual IDEA funds. This is partly because IDEA funding has been assigned to California before the state has apportioned the funding among its districts. Thus, even if false, the LASUD certificate fails the test of being "the cause of the Government's providing the benefit." *See* Boese at 1–29.

■ In addition, although promissory fraud may be actionable in rare circumstances under the FCA, the promise must be false when made. *See U.S. v. Shah*, 44 F.3d 285, 290 (5th Cir.1995) (holding a promise of nondisclosure made after the defendant had made a specific promise to another party to disclose the information was actionable). For a certified statement to be "false" under the Act, it must be an intentional, palpable lie. *Hagood*, 81 F.3d at 1478. Innocent mistakes, mere negligent misrepresentations and differences in interpretations are not false certifications under the Act. *Id.* "For a *qui tam* action to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud." *United States ex rel. Anderson v. Northern Telecom*, 52 F.3d 810, 815 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 700, 133 L.Ed.2d 657 (1996).

Here, the record is devoid of any such showing. In fact, the undisputed evidence leads to the opposite conclusion concerning the School District's intent to be in "general compliance" with applicable laws. LAUSD is one of the largest public school districts in the United States, serving nearly 640,000 students on a $4 billion annual budget. It

has one of the largest special education programs in the country, providing services beyond those required by law. While the School District receives a significant amount of funding from the federal government for special education programs under the IDEA, it spends routinely between 15 and 20 times this amount on special education programs.[8] The School District spends 100% of its IDEA funding on special education programs and services as provided under 20 U.S.C. § 1411(c). To meet state and federal requirements, LAUSD must also take money from the fund intended for general education for all students. This is called "encroachment," and the amount of encroachment typically falls between $160–180 million annually, or roughly 32–36% of the approximate $500 million total budget for special education. With 64,000 students eligible for special education, LAUSD receives 15 complaints of noncompliance every year. This number is consistent with the number of complaints submitted against other California school districts.

The undisputed facts show that it is the School District's general policy to comply with all applicable state and federal laws and regulations and that it has an elaborate administrative structure to do so. The CDOE also monitors LAUSD's compliance with state and federal special education laws. The School District has a policy of curing items of noncompliance with laws or regulations when noted by the CDOE. When the CDOE on February 16, 1990 found the School District out of compliance by excluding classroom teachers from IEP meetings, the CDOE and the School District negotiated over the course of the next two years to solve the problem.

Hopper argues that past regulatory noncompliance creates an inference that the School District lied when certifying future compliance. This is not sufficient evidence to establish knowing fraud under the Act.

### D. DENIAL OF DISCOVERY

A district court's refusal to permit additional discovery is reviewed for an abuse of discretion. *Qualls v. Blue Cross*, 22 F.3d 839, 844 (9th Cir.1994). We will only find that the district court abused its discretion if the movant diligently pursued its previous discovery opportunities and can show how allowing additional discovery would have precluded summary judgment. *Id.* The new material Hopper discovered after the district court granted summary judgment against her was nothing more than additional proof of the School District's continuing failure to comply with federal regulations. Thus, the additional material demonstrating the School District's continued noncompliance would not have prevented the entry of summary judgment against Hopper. Coupled with the fact that Hopper had eighteen months prior to the hearing to conduct discovery, this leads to the conclusion that the district court did not abuse its discretion in denying additional discovery.

### III. THE SCHOOL DISTRICT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

This court reviews a district court's refusal to grant judgment as a matter of law after trial de novo. *Mathis v. Pacific Gas & Elec. Co.*, 75 F.3d 498, 501 (9th Cir.1996). The district court's refusal must be affirmed if there is substantial evidence to support the verdict. *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir.1994). Substantial evidence is evidence reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence. *Id.*

The facts central to the School District's motion are essentially uncontroverted. The paramount issue is whether Hopper has proven a claim of retaliation under 31 U.S.C. § 3730(h) (1994) as a matter of law. The School District contends that (1) Hopper was not investigating fraud and is therefore not covered by § 3730(h); (2) it could not have

---

8. For example, in fiscal year 1989–90, when Hopper first accused LAUSD of failing to comply with federal and state law, LAUSD spent $473,-117,934 on special education, of which $22,054,- 788 came from federal funding under the IDEA. In fiscal year 1990–91, LAUSD spent $511,039,-298 on special education, of which $22,689,953 came from federal funding under the IDEA.

known Hopper was investigating fraud as required under the Act; and (3) it did not retaliate against Hopper because of her complaints. We find merit in the School District's first two arguments. We need not reach the last issue.

 Congress added 31 U.S.C. § 3730(h) to the FCA in 1986 to protect "whistleblowers," those who come forward with evidence their employer is defrauding the government, from retaliation by their employer. S.Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299. Section 3730(h) provides in relevant part as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). Examining the text of the statute, there are three elements the plaintiff must prove in any § 3730(h) claim: 1) the employee must have been engaging in conduct protected under the Act; 2) the employer must have known that the employee was engaging in such conduct; and 3) the employer must have discriminated against the employee because of her protected conduct. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 34–35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299–300; *Mikes v. Strauss,* 889 F.Supp. 746, 752 (S.D.N.Y.1995).

 In this case, Hopper was not engaged in activity protected under the Act. Judgment should have been granted against her as a matter of law. Section 3730(h) only protects employees who have acted "in furtherance of an action" under the FCA. Specific awareness of the FCA is not required. However, the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action. *Neal v. Honeywell Inc.,* 33 F.3d 860, 864 (7th Cir.

1994). *See also Robertson v. Bell Helicopter Textron,* 32 F.3d 948, 950–52 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995) (holding that a plaintiff must be investigating fraud in order to bring a FCA suit to be protected under § 3730(h)).

The entire record fails to demonstrate Hopper was engaged in "furtherance of an action" under the FCA. Rather, the record quite clearly shows Hopper was merely attempting to get the School District to comply with Federal and State regulations. Her numerous written complaints, seventy letters and over fifty telephone calls were all directed toward this end. She was not trying to recover money for the government; she was attempting to get classroom teachers into IEP evaluation sessions. She was not investigating fraud. She was not whistleblowing as envisioned in the paradigm *qui tam* FCA action. *United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 72 F.3d 740, 742 (9th Cir. 1995) (en banc), cert. denied, —— U.S. ——, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996). Quite plainly, the thrust of her complaints was that the School District was failing to meet its IDEA obligations to its students. Correcting regulatory problems may be a laudable goal, but one not actionable under the FCA in the absence of actual fraudulent conduct. Her FCA allegations were not sufficient to pass summary judgment muster. Her investigatory activity did not have any nexus to the FCA. Thus, the district court should have granted the School District's motion for judgment as a matter of law.

Further, unless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h). *Robertson,* 32 F.3d at 952. The legislative history clearly provides that a "whistleblower must show the employer had knowledge the employee engaged in 'protected activity.'" S.Rep. No. 345, 99th Cong., 2d Sess. 35 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5300.

The only party which the jury found guilty of retaliation was Thompson, an individual defendant. Here the parties heatedly argue

about whether Thompson had knowledge of Hopper's complaints to the CDOE. Even if Thompson were intimately familiar with Hopper's complaints, Hopper never gave any indication she was investigating the School District for defrauding the federal government. Thompson may have engaged in retaliation for Hopper's activities, but the record does not show any connection to the FCA. The district court should have granted judgment as a matter of law.

## IV. CONCLUSION

The district court did not err in granting LAUSD's motion for summary judgment on Hopper's *qui tam* action because a violation of a law or regulation standing alone is not proof of a false claim. The district court did not abuse its discretion in refusing additional discovery, because that additional discovery would not have precluded summary judgment. However, the district court erred in refusing to grant LAUSD's motion for judgment as a matter of law because there was no substantial evidence that Hopper was engaged in protected activity or that LAUSD had notice Hopper was engaging in protected activity.

AFFIRMED IN PART, REVERSED IN PART.