**Kimberley LUM, nka Kimberly McNaughton, individually and ex rel United States of America, Plaintiff,**

v.

**VISION SERVICE PLAN, Queen's Health Care, and Alohacare, Defendants.**

**No. CIV.97–00226 SOM/BMK.**

United States District Court,
D. Hawai'i.

June 26, 2000.

Warren Price (argued), (Norma Titcomb, Robert Kohn, present, but did not argue), Price Okamoto Himeno & Lum, Honolulu, HI, for Plaintiff.

Douglas C. Ross (argued), Bradley L. Fisher, Edwin D. Rauzi, Davis Wright Termaine LLP, Seattle, WA, (Louise K.Y. Ing, present, but did not argue), Alston Hunt Floyd & Ing, Honolulu, HI, for Defendant.

*ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; ORDER GRANTING IN PART VISION SERVICE PLAN'S CROSS–MOTION FOR SUMMARY JUDGMENT*

MOLLWAY, District Judge.

## I. INTRODUCTION.

Plaintiff Kimberly Lum ("Lum") claims that Defendant Vision Service Plan

("VSP") violated the False Claims Act by illegally charging a co-payment to adults participating in Hawaii's QUEST program. The parties agreed to file cross-motions seeking a ruling on whether these co-payments were potentially actionable as false claims, and, if so, how many false claims were submitted. The court finds that no potentially actionable false claims were submitted by VSP.

## II. *FACTUAL BACKGROUND.*

The QUEST program provides medical, dental, and behavioral health services to low-income or otherwise eligible individuals through a managed care delivery system. *See* Exhibit 6 to Plaintiff Kimberly Lum's Motion for Partial Summary Judgment ("Lum's Motion") (copy of the Request for Proposal for QUEST Health Plan);[1] *see also* Haw. Admin. R. ("HAR") § 17–1727–02 (Aug. 1, 1994) (QUEST "means the demonstration project developed by the Department which will deliver medical, dental, and behavioral health services, through health plans employing managed care concepts, to certain individuals formerly covered by public assistance programs").

In 1993, the State of Hawaii's Department of Human Services ("DHS") issued a request for proposals ("RFP") to deliver prepaid medical services to individuals enrolled in the QUEST program, including Medicaid recipients. *See* RFP § 10.100 ("This RFP solicits participation by qualified health plans for the provision of the required medical, dental and behavioral health services to eligible QUEST recipients. The services shall be provided in a managed care environment with reimbursement to qualifying health plans based on fully capitated rates").

Island Physicians Association, d.b.a. Queen's Hawaii Care ("Queens"), and AlohaCare, Inc. ("AlohaCare") responded to the solicitation and were awarded contracts. *See* Exhibits 2 and 3 to Lum's Motion (selected pages from agreements between DHS and Queens ("Queens Agreement"), and DHS and AlohaCare ("AlohaCare Agreement")). Queens and AlohaCare agreed to "comply with all requirements defined in the RFP ... in exchange for payment of the monthly capitation by State."[2] Queens Agreement § 4.1; AlohaCare Agreement § 4.1. Pursuant to the RFP, Queens and AlohaCare were required to "comply with all laws, ordinances, codes, rules and regulations of the federal, state and local governments which in any way affect [their] performance under [these] contract[s]." RFP § 60.100.

Both Queens and AlohaCare entered into subcontracts with VSP under which VSP was to provide the vision care component of the Queens Agreement and AlohaCare Agreement. *See* Exhibits 4 and 5 to Lum's Motion (selected pages from subcontracts between VSP and Queens ("Queens Subcontract"), and VSP and AlohaCare ("AlohaCare Subcontract")). Pursuant to these subcontracts, VSP also agreed to comply with all applicable federal and state laws, rules and regulations. Queens Subcontract § 9 ("HMO and VSP agree to comply with all requirements of municipal, county, and state and federal laws and regulations"); AlohaCare Subcontract § 5.11 ("Provider [VSP] agrees to cooperate with AlohaCare so that AlohaCare may meet any requirements imposed on AlohaCare by state, municipal and federal laws").[3]

---

1. At the hearing on the cross-motions, the parties stipulated to the authenticity of all of the documents attached to Lum's Motion.

2. "Capitation" means "the prepaid fixed dollar amount State agrees to pay each month to Contractor for each recipient enrolled in the health plan, regardless of whether the recipient received any services." Queens Agreement § 1; AlohaCare Agreement § 1.

3. The selected pages from the respective subcontracts do not indicate whether VSP agreed to comply with the provisions of the underlying Queens Agreement or the AlohaCare Agreement.

For purposes of the pending motions, VSP and Lum stipulated that both Queens and AlohaCare had agreed that VSP could charge adult QUEST members a $7 co-payment.[4] These co-payments were expressly prohibited under the RFP and applicable law. RFP § 40.610 ("There will be no co-payment amounts for services provided to recipients with incomes below 133% of the federal poverty level and all children (up to age 19).... In essence, anyone who would have qualified for the existing Medicaid AFDC-related or GA programs ... shall not be assessed co-payments"); see 42 U.S.C. § 1396o;[5] HAR §§ 17–1727–44 (enrollees who are not responsible for co-payments) and 17–1727–45 (enrollees responsible for co-payments).

From July to November 1996, VSP charged some QUEST program members a $7 co-payment. That is, some members had to pay $7 of their own money when they sought vision care covered by the program. Declaration of Larma Garcia (November 29, 1999) ¶ 4 ("Based upon the business records of VSP and my research, and upon information and belief, some of QHC's [Queens'] adult members were assessed a copayment during the three months between August and early-October of 1996") and ¶ 7 ("Based upon the business records of VSP and my research, and upon information and belief, some of AlohaCare's adult members were assessed a

copayment for dates of service that occurred during the five months between mid-July and early-November of 1996").

VSP's standard business practice was to submit monthly bills for its services to HMO plans such as Queens and AlohaCare. Declaration of Pamela Busby (November 23, 1999) ¶ 4. Exhibits 1 through 3 attached to Busby's Declaration are typical of the invoices that VSP sent to HMO plans. Busby Decl. ¶¶ 6–8. The bills contained billing data and calculations only; no express statements of compliance with any law or contract were included with the bills. There is no dispute that, upon receiving VSP's bills, Queens and AlohaCare billed DHS for vision services pursuant to the Queens Agreement and the AlohaCare Agreement.

Lum brought this qui tam action, alleging that VSP violated the False Claims Act by submitting "false claims" to Queens and AlohaCare that were eventually billed to the government. She says that VSP's invoices were false because VSP had agreed not to charge a co-payment, which was illegal, and VSP had, in fact, charged that co-payment.

Lum and VSP agreed to file cross-motions ˘ that sought a determination of whether, and how many, potentially actionable "false claims" were made for purposes of the False Claims Act. See Report on Second Scheduling Conference and Order ¶ 5 ("By November 1, 1999, Plaintiff shall

---

**4.** For purposes of these cross-motions, the court assumes this to be true. However, the court notes that Queens and AlohaCare have not admitted that agreement.

**5.** Under 42 U.S.C. § 1396o(a)(2):

no deduction, cost sharing or similar charge will be imposed under the plan with respect to—

(A) services furnished to individuals under 18 years of age (and, at the option of the State, individuals under 21, 20, or 19 years of age, or any reasonable category of individuals 18 years of age or over),

(B) services furnished to pregnant women, if such services relate to the pregnancy or to any other medical condition which may complicate the pregnancy (or, at the

option of the State, any services furnished to pregnant women),

(C) services furnished to any individual who is an inpatient in a hospital, nursing facility, intermediate care facility for the mentally retarded, or other medical institution, if such individual is required, as a condition of receiving services in such institution under the State plan, to spend for costs of medical care all but a minimal amount of his income required for personal needs,

(D) emergency services (as defined by the Secretary), family planning services and supplies described in section 1396d(a)(4)(C) of this title, or

(E) services furnished to an individual who is receiving hospice care (as defined in section 1396d(o) of this title).

file a motion for summary judgment on the question of whether defendants (or any of them) presented or caused to be presented a claim which is potentially actionable under the False Claims Act, 33 U.S.C. § 3729, and, if so, how many such claims were presented or caused to be presented").

### III. SUMMARY JUDGMENT STANDARD.

Summary judgment shall be granted when:

the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment must be granted against a party who fails to demonstrate facts to establish what will be an essential element at trial. *Id.* at 322, 106 S.Ct. 2548. In the present case, the underlying facts are undisputed. The court is being asked to determine whether these facts amount to violations of the False Claims Act.

### IV. FALSE CLAIMS ACT LIABILITY.

#### A. Whether Potentially Actionable False Claims Were *Made*.

■ The False Claims Act was enacted during the Civil War to curtail wide-spread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir.1996), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997). Lum claims that VSP violated the False Claims Act. Specifically, Lum alleges that subsections 1, 2, 3, and/or 7 of 31 U.S.C. § 3729(a) were violated by VSP. These subsections generally make it illegal for a person to submit or cause to be submitted any false claim for payment to the government.[6]

■ For purposes of the False Claims Act, a "claim" is defined as

any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c). Under the plain language of section 3729(c), VSP clearly made "claims" by billing Queens and AlohaCare, who, in turn, billed DHS. Those claims, however, were not "false." Accordingly, those claims are not actionable under the False Claims Act.

■ Lum agreed at the hearing that the express representations on VSP's bills concerned only billing information. *See also* Ex. 1 through 3 attached to Busby Decl. Lum argues, however, that those bills contained an implied certification that VSP would not violate applicable law, in-

---

**6.** As an initial matter, this court must determine whether this court has jurisdiction over Lum's claims. Article III, Section 2, of the Constitution confines federal courts to deciding cases or controversies. To qualify for federal court adjudication, a plaintiff must show that an actual controversy exists at all stages of the case. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). No case or controversy exists if a plaintiff lacks standing to make the claims asserted. In the present case, VSP has correctly agreed that Lum has standing to bring her False Claims Act claims in light of *Vermont Agency of Nat. Resources v. United States*, —— U.S. —— at ——, 120 S.Ct. 1858, 146 L.Ed.2d 836, 2000 WL 646252 at * 4 (May 22, 2000) (holding that the United States' injury in fact suffices to confer standing upon a qui tam plaintiff because that plaintiff is the assignee of the United States' claim).

cluding laws prohibiting co-payments. Lum says that VSP's assessment of a $7 co-payment on QUEST members violated 42 U.S.C. § 1396o, HAR §§ 17–1727–44, and 17–1727–45.[7] Lum concludes that the claims submitted by VSP to Queens and AlohaCare were therefore false. Lum's argument is unpersuasive. There was nothing false about the bills. The bills did not impose the $7 co-payment. Nor did the bills promise compliance with any law. The bills merely contained billing information. The False Claims Act attaches liability to false and fraudulent claims for payment, not to underlying activity that is allegedly fraudulent. *Anton,* 91 F.3d at 1266. Accordingly, violations of laws, rules, or regulations alone do not create False Claims Act liability. *Id.*

In *Anton,* the plaintiff argued that her school district violated the False Claims Act by submitting to the California Department of Education ("CDOE") an inaccurate count of special education students. *Anton,* 91 F.3d at 1265. Because the CDOE received federal funding, she argued that the school district's submission of incorrect numbers constituted a False Claims Act violation. The Ninth Circuit disagreed, holding that the False Claims Act attaches liability only to false and fraudulent claims for payment. *Id.* at

1266. "Violations of laws, rules, or regulations alone do not create a cause of action under the FCA [False Claims Act]". *Id.* In *Anton,* there was no claim for payment that was false or fraudulent. The inaccurate count was rather only a violation of a regulatory provision. Accordingly, there was no False Claims Act liability in *Anton.* In the present case, VSP similarly did not violate the False Claims Act because it did not present a false or fraudulent claim for payment.[8]

■ Lum next argues that VSP must be seen as having impliedly certified compliance with law because compliance with law was a prerequisite to payment. While, in *Anton,* the Ninth Circuit recognized this concept, it noted that "it is the false *certification* of compliance which creates liability when certification is a prerequisite for obtaining a government benefit." *Anton,* 91 F.3d at 1266. *Accord United States ex rel. Plumbers and Steamfitters Local Union No. 38 v. C.W. Roen Constr. Co.,* 183 F.3d 1088, 1092 (9th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 2195, 147 L.Ed.2d 232 (2000). It is not at all clear that certification was a prerequisite for payment to VSP, but, even if it was, a mere regulatory violation would not give rise to a viable False Claims Act action.[9] *Anton,* 91 F.3d at 1267. There are administrative and

---

7. Only if a person "knowingly" makes, uses, or causes to be made or used a false claim is 31 U.S.C. § 3729(a) violated. Whether the False Claims Act was, in fact, violated is not before the court at this time because the issue of VSP's scienter is not before the court. *See* Report of Second Scheduling Conference ¶ 5 ("The remaining requirements of the False Claims Act, including the issue of whether any claims were 'knowingly' presented, will not be determined on this motion").

8. Lum cites *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 n. 7 (4th Cir.1999), to argue that there is no requirement that the government have suffered damages for a False Claims Act violation to occur. Lum misses the point. *Harrison* holds that the false statement or claim must be material, meaning that the false statement or claim must have a natural tendency to influence action. Here, no false claim was presented to the government at all.

9. There is insufficient evidence to conclude that VSP's compliance with law was a prerequisite for payment. Lum says that section 4.1 of both the Queens Agreement and the AlohaCare Agreement make compliance with law a prerequisite for payment. That section reads: "Contractor agrees to comply with all requirements in the RFP ... in exchange for payment of the monthly capitation by State." The court disagrees that section 4.1 expressly conditions payment on compliance with the RFP. Instead, the government is contractually obligated to pay in exchange for Queens' and AlohaCare's performance of contractual duties. This finding is bolstered by section 61.650 of the RFP, which indicates that payment is independent of any obligation to comply with law. *See* RFP § 61.650 ("By the tenth working day of the benefit month, DHS *shall* issue a single payment to the health plan for premiums due for the benefit month") (emphasis added). In any event, no certifica-

other remedies for regulatory violations. Absent express false certifications upon which funding is conditioned, the False Claims Act provides no remedy. *Id.*

Lum relies on *Ab–Tech Constr., Inc. v. United States,* 31 Fed. Cl. 429 (1994), *aff'd,* 57 F.3d 1084 (Fed.Cir.1995), for the proposition that VSP impliedly certified its compliance with law as a prerequisite to payment and therefore violated the False Claims Act. Lum's reliance on *Ab–Tech* is misplaced. In *Ab–Tech,* the defendant, as a condition of approval for a Small Business Administration ("SBA") supply and construction contract, was required to sign a "Statement of Cooperation" acknowledging its understanding of, and promising compliance with, requirements for continuing eligibility. *Id.* at 432. Pursuant to 15 U.S.C. §§ 631–697c, the SBA was authorized to enter into contracts for the procurement of supplies and services with small businesses owned and controlled by socially and economically disadvantaged individuals. *Id.* at 431–32. Ab–Tech deliberately concealed a relationship with another company that made Ab–Tech ineligible for the SBA contract. *Id.* at 434. Indeed, the company's president was charged with having engaged in criminal activity in that regard and was convicted. *Ab–Tech* noted that the False Claims Act reaches beyond demands for money that fraudulently overstate an amount due, extending liability to all fraudulent attempts to cause the government to pay out sums of money. *Id.* at 433. *Ab–Tech* held that the progress payment vouchers submitted by Ab–Tech to the government represented an implied certification of the defendant's continuing adherence to the minority-ownership requirements of participation in the contracts. *Id.* at 434. Ab–Tech's deliberate withholding of information making it ineligible for the contract was a false claim because it "caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the ... program." *Id.* at 434.

tion of compliance with law was made when

*Ab–Tech* is inapposite to the present case because there is no evidence that the $7 co-payment assessed by VSP caused the government to pay out funds. *Id.* at 434; *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997) (the FCA "interdicts material misrepresentations made to qualify for government privileges or services") (quoting *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 460–61 (5th Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978)); *Luckey v. Baxter Healthcare Corp.,* 2 F.Supp.2d 1034, 1045 (N.D.Ill. 1998) (noting that the key inquiry is whether the claim in question has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment), *aff'd,* 183 F.3d 730, *cert. denied,* —— U.S. ——, 120 S.Ct. 562, 145 L.Ed.2d 439 (1999). Here, VSP charged the QUEST program members, not the government. This court cannot conclude that the submission of bills that were silent as to the co-payments constituted a false claim. Even broadly read, *Ab–Tech* did not hold that every illegal act automatically renders a claim false under the False Claims Act. This court concludes that VSP did not submit to the government any claims that were false for purposes of the False Claims Act.

### B. *Number of Violations.*

Because this court has already determined that no "false claims" were made, the issue of how many "false claims" were made is moot.

## V. CONCLUSION.

The court finds that VSP did not submit any false claims for payment that are potentially actionable under the False Claims Act. Accordingly, Lum's motion for partial summary judgment is denied. To the extent VSP sought a ruling that no false claims were made for purposes of the False Claims Act, VSP's motion is granted.

VSP submitted its invoices for payment.

The remaining portion of VSP's motion is denied as moot.

This order leaves for further adjudication Lum's Whistleblower Protection Act claims against VSP.

IT IS SO ORDERED.