UNITED STATES of America, ex rel.
Daniel YESUDIAN, Appellant/Cross–
Appellee,

v.

HOWARD UNIVERSITY, et al.,
Appellees/Cross–Appellants.

Nos. 96–7225, 96–7226.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 6, 1997.

Decided Sept. 1, 1998.

James L. Kestell argued the cause and filed the briefs for appellant/cross-appellee.

Timothy F. McCormack argued the cause and filed the briefs for appellees/cross-appellants. Charles S. Fax entered an appearance.

Before: WALD, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

Opinion dissenting in part filed by Circuit Judge KAREN LeCRAFT HENDERSON.

GARLAND, Circuit Judge:

Howard University terminated Dr. Daniel Yesudian from his job in the University's Purchasing Department on May 1, 1992. The University said he was terminated for insubordination; Yesudian claimed he was discharged in retaliation for whistleblowing activities protected by the False Claims Act, 31 U.S.C. §§ 3729–3733. Yesudian sued the University and three of his supervisors, alleging submission of false claims in violation of the False Claims Act, retaliation for reporting the alleged false claims, and breach of contract. The jury returned verdicts for Yesudian on his retaliation claim against one of his supervisors, Joseph Parker, and on his breach of contract claim against the University, and awarded $180,000 in back pay. It found against Yesudian on his allegation that false claims were submitted in violation of the Act, and on his allegations that the University and the supervisors other than Parker had retaliated against him.

After the verdicts, the district court granted Parker's motion under Fed.R.Civ.P. 50 for judgment as a matter of law against Yesudian on the retaliation claim, but denied the University's Rule 50 motion on the breach of contract claim. *See United States ex rel. Yesudian v. Howard Univ.*, 946 F.Supp. 31 (D.D.C.1996). Both Yesudian and the defendants appealed. We conclude there was sufficient evidence to support the jury's verdict on both claims. We therefore reverse the grant of judgment as a matter of law on the retaliation claim and affirm the denial of judgment as a matter of law on the contract claim.

## I

Yesudian began working at Howard in 1971. After several promotions, he was transferred to the Purchasing Department in 1983. From 1984 to 1992, Yesudian discovered and repeatedly complained to upper-level University officials about financial improprieties allegedly committed by the Purchasing Department and its director, Joseph Parker.[1] Specifically, Yesudian charged that Parker falsified time and attendance records for his administrative assistant, provided inside information to favored vendors to aid them in the bidding process, accepted bribes from vendors, permitted payments to vendors who did not provide services to the University, and took University property home.

Yesudian brought these problems to the attention of the University's Director of Accounting in 1984 and to the Executive Assistant to the Vice President for Business and Fiscal Affairs in 1986. The latter told him: "You know, Dan, you don't want to be the whistle-blower." App. 57. Beginning in 1987, Yesudian attempted to bring his complaints to Melvin W. Jones, the University's Vice President for Business and Fiscal Affairs. Yesudian finally met with Jones in the summer of 1989 to discuss his complaints. *See* Def.'s Ex. 44. On May 11, 1990, Yesudian sent Jones a memorandum detailing his charges, *see id.*, and on May 16, Jones wrote back, noting that Yesudian had "made a number of charges against the Purchasing Department which are of serious concern to me." Def.'s Ex. 43. Jones specifically listed Yesudian's allegations of "cooperating in the cheating of the University with the Time and Attendance Records," "[p]roviding 'Inside Information' to selected vendors," "[a]ccepting bribes from vendors," and "[t]aking University property home." *Id.; see* Trial Tr. 234–35. Meanwhile, on several occasions from 1987 through 1990, Parker and his deputy, George Varghese, took disciplinary action against Yesudian assertedly for misconduct and various forms of insubordination.

In 1991, Yesudian sent a letter detailing his concerns to the President of the University, whose executive assistant referred him to the new Vice President for Business and Fiscal Affairs, James Fletcher II. In March 1992, Fletcher met with Yesudian. Yesudian told him of his findings, including false entries on the attendance records of Parker's assistant and payments to vendors who did not provide services to the University. Ye-

---

1. In reviewing a district court's decision on a motion for judgment as a matter of law, we view the evidence in the light most favorable to the nonmoving party—here, Yesudian. *See Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 782 (D.C.Cir.1998).

sudian also gave Fletcher a packet of documents he said supported the claims. *See* App. 74–75. Fletcher told Yesudian he was interested in the allegations and would investigate. On April 16, 1992, Parker called Yesudian into his office and, with Varghese present, read him verbatim the allegations Yesudian had made against Parker in the documents Yesudian had given Fletcher. Parker asked if Yesudian had made the allegations to Fletcher and, when Yesudian admitted that he had, Parker became visibly upset. Varghese then warned Yesudian, "[I]f you do this kind of stuff, you're not going to be in this department." App. 80. After the meeting, Yesudian sent Fletcher a letter reporting that Parker and Varghese had "threatened [him] with severe actions for inaccurately representing the efficient operation of the department to [Fletcher]," App. 82–83, and that he had "been told that somehow [he] would be 'gotten rid of' because [he] brought to [Fletcher's] attention some of the corrupt practices … extant in the department." App. 220.

The day after the confrontation between Parker, Varghese, and Yesudian, Parker told Yesudian to obtain from the General Services Administration (GSA) a copy of a contract between the University and a fuel vendor. On the next business day, Yesudian spoke with his contact at GSA, who said she would send the contract over with two other Howard employees who were scheduled to attend a fuel users' meeting at GSA the next morning, April 21. When Yesudian told Varghese of these arrangements, Varghese insisted that Yesudian personally go that day to pick up the contract. Yesudian explained that he was without a car and had no way to get to GSA. On the morning of April 21, Varghese gave Yesudian a letter directing him to attend the fuel users' meeting that day. Yesudian refused to open the letter and told Varghese he felt sick. Yesudian requested permission to go to the employee health clinic, which Varghese refused. Parker, however, authorized Yesudian to go to the clinic on the understanding that Yesudian would attend the GSA meeting if cleared to return to work. The clinic found that Yesudian had high blood pressure and advised him to go

home. Although Parker approved Yesudian's leaving for the rest of the day, Yesudian remained at work.

On April 23, 1992, Varghese accused Yesudian of insubordination for not attending the fuel users' meeting and for refusing to open the letter. Varghese recommended three months' probation and threatened termination for future infractions. Parker, however, recommended that Yesudian be fired, and Vice President Fletcher approved Yesudian's termination effective May 1. Yesudian appealed through the University's grievance procedure. Although the hearing officer found Yesudian had failed to meet his burden of showing he was terminated in retaliation for his complaints, she found the charges of insubordination unsupported and Yesudian's termination "unfair." App. 217. She did not, however, recommend reinstatement because of Yesudian's "lack of respect for the abilities and commitment of [his superiors]." App. 218. Instead, she recommended that Howard remove the termination from Yesudian's record if he agreed to accept an "early out" or retirement. Yesudian refused the offer.

## II

We review de novo a district court's ruling on a motion for judgment as a matter of law. *See Smith v. Washington Corp.*, 135 F.3d 779, 782 (D.C.Cir.1998). Entry of such a judgment is warranted only if "no reasonable juror could reach the verdict rendered in th[e] case." *Anderson v. Group Hospitalization, Inc.*, 820 F.2d 465, 473 (D.C.Cir. 1987). "In making that determination, a court may not assess the credibility of witnesses or weigh the evidence." *Hayman v. National Academy of Sciences*, 23 F.3d 535, 537 (D.C.Cir.1994). Moreover, "[b]ecause a judgment as a matter of law intrudes upon the rightful province of the jury, it is highly disfavored." *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C.Cir.1994).

## III

The district court granted Parker judgment as a matter of law on Yesudian's claim of retaliatory discharge under the False Claims Act.[2] The Act imposes a civil penalty

---

2. We note that the parties' fierce contest over this claim may be much ado about nothing. The

court below entered judgment for Yesudian in

and treble damages upon any person who, among other things, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). Section 3730(b) provides that "private persons," commonly known as "relators," may bring a civil action for a violation of § 3729 "in the name of the Government." 31 U.S.C. § 3730(b). The statute permits the government to take over the action and conduct it itself, or to decline to take over the action, in which case the relator has the right to conduct it. *See id.* The relator is entitled to different percentages of any recovery from a successful False Claims Act suit, depending upon whether the relator or the government conducts the action. *See* 31 U.S.C. § 3730(d)(1)-(2).

Congress passed the precursor of the present statute, also referred to as the "Lincoln Law," to combat widespread fraud in defense contracts during the Civil War. *See* S. REP. No. 99–345, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273; Anna M.W. Burke, *Qui Tam: Blowing the Whistle for Uncle Sam,* 21 NOVA L. REV. 869, 872 (1997). The provision for private actions, commonly known as qui tam suits,[3] was included to augment the government's own limited enforcement resources. *See* S. REP. No. 99–345, at 7, 23, 26, *reprinted in* 1986 U.S.C.C.A.N. at 5272, 5288, 5291.

In 1986, in response to concern that employees who exposed false claims were being punished by their companies, Congress amended the False Claims Act "to provide for 'whistleblower' protection." *Id.* at 34, *reprinted in* 1986 U.S.C.C.A.N. at 5299. The new subsection, § 3730(h), states:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee ... in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole....

31 U.S.C. § 3730(h). The purpose of the provision, the Senate Judiciary Committee said, was to "assure those who may be considering exposing fraud that they are legally protected from retaliatory acts." S. REP. No. 99–345, at 34, *reprinted in* 1986 U.S.C.C.A.N. at 5299.

As § 3730(h) suggests, to make out a claim of retaliation, an employee must demonstrate that: (1) he engaged in protected activity, that is, "acts done ... in furtherance of an action under this section"; and (2) he was discriminated against "because of" that activity. To establish the second element, the employee must in turn make two further showings. The employee must show that: (a) "the employer had knowledge the employee was engaged in protected activity"; and (b) "the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity." S. REP. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300. *See generally United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.,* 123 F.3d 935, 944 (6th Cir.1997); *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1269 (9th Cir.1996).[4]

The district court concluded there was no evidence from which the jury could reasonably have found the first element of a retaliation claim—that Yesudian had engaged in protected conduct—because "he never initiated a government investigation or a private qui tam suit" during the time he was making

---

the amount of $180,000 on his contract claim, which we uphold *infra.* In the course of granting judgment against Yesudian on the retaliation claim, the court suggested that Yesudian would not have been entitled to an additional recovery on that claim in any event. *See Yesudian,* 946 F.Supp. at 36 n. 8.

**3.** "Qui tam" is an abbreviation of the phrase *"qui tam pro domino rege quam pro si ipso in hac parte sequitur,"* which means "[w]ho sues on behalf of the King as well as for himself." BLACK'S LAW DICTIONARY 1251 (6th ed.1990).

**4.** According to the Senate Report, "[o]nce these elements have been satisfied, the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity." *Id.; see also Mikes v. Strauss,* 889 F.Supp. 746, 754 (S.D.N.Y.1995).

his complaints. *Yesudian,* 946 F.Supp. at 33. The court also concluded there was no evidence to support the first part of the second element—that the defendant knew Yesudian was engaged in protected activity—because Yesudian "never suggested to defendant that he intended to utilize his allegations in furtherance of a False Claims Act action" and "gave no suggestion that he was going to report the alleged improprieties to government officials." *Id.* Defendant Parker asserts an additional reason in support of the court's conclusion on the first element: because there was no evidence that a false claim ever was presented to the U.S. Government, Parker contends, Yesudian cannot establish that he was engaged in protected conduct.

We consider each of these arguments below, beginning with Parker's additional argument, which he raised in the district court but upon which the court did not rely. *See Dimond v. District of Columbia,* 792 F.2d 179, 187 (D.C.Cir.1986) ("An appellate court ... can consider any argument made on appeal that supports the judgment of the District Court."). We conclude that all of these arguments misapprehend the requirements of a retaliation claim, and further conclude that there was sufficient evidence for a reasonable jury to have found those elements satisfied in this case.

### A

Parker contends that Yesudian cannot establish he was engaged in protected conduct because a viable qui tam action requires that the alleged false claims be presented to the U.S. Government, and not just to a grantee of federal funds like Howard University. As there was no evidence that any false claim was transmitted by Howard to the United States, Parker contends there was no viable False Claims Act case here. Yesudian, on the other hand, argues that a False Claims case can be made out by proof of the submission of false claims to a grantee alone. Although we consider this dispute about the requirements of a successful qui tam action below, we conclude that we need not ultimately resolve it in order to decide the retaliation case before us.

As Parker points out, § 3729(a)(1) requires that the alleged false claim be "present[ed]

or cause[d] to be presented, to an officer or employee of the United States Government." Prior to 1986, some courts did read this to exclude claims presented only to grantees of federal funds from coverage under the Act. *See* S. REP. No. 99–345, at 21, *reprinted in* 1986 U.S.C.C.A.N. at 5286 (citing, inter alia, *United States ex rel. Salzman v. Salant & Salant, Inc.,* 41 F.Supp. 196 (S.D.N.Y.1938) (claim against the Red Cross)). But Congress amended the Act in 1986 by inserting—in addition to the whistleblower provision noted above—a new definition of "claim":

> For purposes of this section, "claim" includes any request or demand ... for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c).

The purpose of this new definition, both the Senate and House Reports state, was to "clarif[y] that the statute permits the Government to sue under the False Claims Act for frauds perpetrated on Federal grantees, including States and other recipients of federal funds." S. REP. No. 99–345, at 21, *reprinted in* 1986 U.S.C.C.A.N. at 5286; *see also id.* at 10, *reprinted in* 1986 U.S.C.C.A.N. at 5275; H.R. REP. No. 99–660, at 21 (1986). The Senate Judiciary Committee indicated that the new subsection was inserted in response to the earlier court holdings that "a fraud against the grantee does not constitute a fraud against the Government of the United States" where "once the United States has made the grant to the State ... or other institution, it substantially relinquishes all control over the disposition of the money." S. REP. No. 99–345, at 21, *reprinted in* 1986 U.S.C.C.A.N. at 5286 (citing *Salzman,* 41 F.Supp. 196). At the same time, the Committee approvingly cited cases that appeared to cover claims against grantees regardless whether those claims were retransmitted to the United States. *See id.* at 10, 22, *reprint-*

*ed in* 1986 U.S.C.C.A.N. at 5275, 5287 (citing *United States ex rel. Davis v. Long's Drugs, Inc.*, 411 F.Supp. 1144, 1146–47 (S.D.Cal. 1976)).

It is still possible, of course, to argue that Congress did not quite achieve the objective of making all false claims to grantees subject to the Act. The new subsection is merely entitled "Claim defined," while for the Act's "liability" provision we still must look to § 3729(a). If we put the two subsections together, we have a requirement that the defendant "knowingly present[ ], or cause[ ] to be presented, to an officer or employee of the United States ... a false or fraudulent .... request ... to a ... grantee ... if the United States Government provides any portion of the money ... which is requested ..., or if the Government will reimburse [the] ... grantee ... for any portion of the money ... which is requested." 31 U.S.C. § 3729(a), (c). This could be read narrowly to mean that requests to a grantee which are in turn presented by the grantee to the United States are covered, but that Congress dropped a stitch if it also meant to cover—as it indicated it did—the situation where the government already has given the money to the grantee but has "relinquishe[d] all control over the disposition of the money" before the false claim is made. S. REP. No. 99–345, at 21, *reprinted in* 1986 U.S.C.C.A.N. at 5286.

Although it is possible to read the statute in this narrow way, such a reading would leave intact those court opinions Congress seemingly intended to overrule. As Yesudian suggests, it is also possible to read the language to cover claims presented to grantees, but "effectively" presented to the United States because the payment comes out of funds the federal government gave the grantee. Such a reading would be in harmony with the legislative history. As the Senate Judiciary Committee put it, without adding any "presentation" caveat, "a false claim to the recipient of a grant from the United States or to a State under a program financed in part by the United States is a false claim to the United States." *Id.* at 10, *reprinted in* 1986 U.S.C.C.A.N. at 5275.[5]

It may be that this reading—that a claim to a grantee is effectively a claim to the United States—should not apply to all grantees. It may not be appropriate, for example, where the grantee's federal funds are an insubstantial percentage of its total budget, where there is little likelihood that any of a defendant's money actually came from the federal grant, or where there is little continuing contact between the grantee and the government once the grant is made.

Parker is correct in noting that the legislative history of the False Claims Act amendments states that "a false claim is actionable although the claims or false statements were made to a party other than the Government, *if the payment thereon would ultimately result in a loss to the United States.*" S. REP. No. 99–345, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 5275 (emphasis added); *see* H.R. REP. No. 99–660, at 21.[6] Although the statute itself does not contain this requirement, it may be another way of saying that before a claim on a grantee can be considered a claim on the United States, there must be a sufficiently close nexus between the two such that a loss to the former is effectively a loss to the latter.

Such possible caveats are not relevant here, however, because Howard University is

---

5. The Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), cited approvingly by the Senate Judiciary Committee, *see* S. REP. No. 99–345, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 5275, includes dicta supportive of Yesudian's reading. The Court said that "[federal] funds [granted to the states] are as much in need of protection from fraudulent claims as any other federal money, and the statute does not make the extent of their safeguard dependent upon the bookkeeping devices used for their distribution." 317 U.S. at 544, 63 S.Ct. 379 (footnote omitted). In *Marcus*, however, estimates of the false claims were transmitted to the government.

6. It is not necessary, however that a loss actually result; it is sufficient that the defendant makes a false claim that would result in a loss if it were paid. *See* S. REP. No. 99–345, at 8, *reprinted in* 1986 U.S.C.C.A.N. at 5273 ("A forfeiture may be recovered from one who submits a false claim though no payments were made on the claim."); *see also Rex Trailer Co. v. United States*, 350 U.S. 148, 152–53 & n. 5, 76 S.Ct. 219, 100 L.Ed. 149 (1956) (discussing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943)).

a relatively unique grantee in all of these respects. According to the testimony at trial, over 80% of Howard's money comes from the federal government.[7] Congress has authorized annual appropriations of federal funds for Howard, see 20 U.S.C. § 123, and has authorized the Secretary of Education to make matching grants for the University's endowment, see id. § 130aa–1. Howard is also authorized to make purchases through the General Services Administration. See id. § 130. Moreover, the University is required by federal statute "at all times [to] be open to inspection by the Secretary of Education and shall be inspected by the said Secretary at least once each year." Id. § 123. And each year, Howard must submit to the Secretary of Education "a statement showing the receipts of the institution and from what sources, and its disbursements, and for what objects." Id. § 121 (emphasis added).

In addition, the Senate Judiciary Committee made clear that it intended the concept of loss to the United States to be considered broadly. As the Committee noted, the Seventh Circuit had held in United States v. Azzarelli Construction Co., 647 F.2d 757 (7th Cir.1981), that there was no loss to the United States, and hence no viable False Claims Act suit, where the federal government had contributed a fixed sum to Illinois for highway projects and thus would have paid out the same amount regardless whether contractors submitted false claims to the State. The Committee made clear it disapproved of this result, and expressly "intend[ed] the new subsection ... to overrule Azzarelli and similar cases which have limited the ability of the United States to use the act to reach fraud perpetrated on federal grantees, contractors or other recipients of Federal funds." S. Rep. No. 99–345, at 22, reprinted in 1986 U.S.C.C.A.N. at 5287.

Congress, then, plainly regarded a false claim as causing a loss to the United States in the Azzarelli situation, notwithstanding that the false claim would not lead to an additional pay-out of federal funds. Much the same is true here. Whether or not the United States Government would be out additional money beyond that already appropriated for Howard, it would suffer a loss if the money appropriated for legitimate purposes were instead wasted on a false claim. And given the testimony that 80% of Howard's funds come from the federal government, the likelihood is high that the government would suffer this kind of loss if Howard were to pay a false claim.

**B**

Although the above analysis suggests that a qui tam suit brought against defendant Parker for submitting a false claim to Howard University could prevail even without evidence that the claim was resubmitted to the federal government, we need not resolve that question today. We do not, after all, have before us an appeal from a judgment against Yesudian on his qui tam claim. The jury decided against Yesudian on that claim and he has not appealed. Instead, the issue before us is an appeal from a judgment as a matter of law against Yesudian on his claim that Parker retaliated against him because of his protected conduct. And the protected conduct element of such a claim does not require the plaintiff to have developed a winning qui tam action before he is retaliated against. See S. Rep. No. 99–345, at 35, reprinted in 1986 U.S.C.C.A.N. at 5300; United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1522 (10th Cir.1996).[8] It requires only that the plaintiff have engaged in "acts ... in furtherance of an action under this section." 31 U.S.C. § 3730(h) (emphasis added).

There is nothing in that language to suggest that the employee must already have

---

7. Yesudian testified to this figure, based on his "personal knowledge." Notwithstanding an invitation from the trial judge to cross-examine Yesudian on this point, defendants failed to contest the testimony at trial. See App. 62–63. At oral argument, defendants contended that 60% of Howard's budget is provided by the federal government through a direct line-item appropriation.

8. Cf. Passaic Valley Sewerage Comm'rs v. Department of Labor, 992 F.2d 474, 479 (3d Cir.1993) ("'[A]n employee's non-frivolous complaint should not have to be guaranteed to withstand ... external review in order to merit protection under [the Clean Water Act] for the obvious reason that such a standard would chill employee initiatives in bringing to light perceived discrepancies in the workings of their agency.'").

discovered a completed case. To the contrary, § 3730(h) expressly includes "investigation for . . . an action filed or to be filed" within its protective cover. This manifests Congress' intent to protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together. *See Neal v. Honeywell Inc.,* 33 F.3d 860, 864 (7th Cir.1994). Indeed, it is for this reason that courts have held employees' activities protected although they have not filed qui tam suits. *See id.* at 864–65; *Childree v. UAP/GA AG CHEM., Inc.,* 92 F.3d 1140, 1144, 1146 (11th Cir.1996); *Ramseyer,* 90 F.3d at 1522. And it is for this reason that the district court erred in holding Yesudian's conduct was unprotected because "he never initiated . . . a private qui tam suit." 946 F.Supp. at 33.

■ As even defendant concedes, therefore, it is sufficient that a plaintiff be investigating matters that "reasonably could lead" to a viable False Claims Act case. Def. Br. at 21. This view is in accord with that of the other Circuits. *See Childree,* 92 F.3d at 1146 (11th Cir.1996) (requiring only "distinct possibility" of suit); *Hopper,* 91 F.3d at 1269 (9th Cir.1996) (holding that "plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action"); *Neal,* 33 F.3d at 864 (7th Cir.1994) (holding that § 3730(h) covers situation where litigation was a "distinct possibility" or "could be filed legitimately"). Mere dissatisfaction with one's treatment on the job is not, of course, enough. Nor is an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations. *See Hopper,* 91 F.3d at 1269; *Ramseyer,* 90 F.3d at 1523; *see also Zahodnick v. IBM Corp.,* 135 F.3d 911, 914 (4th Cir.1997) ("Simply reporting his concern of a *mischarging* to the government to his supervisor does not suffice to establish that Zahodnick was acting 'in further'ance of' a qui tam action.") (emphasis added). To be covered by the False Claims Act, the plaintiff's investigation must concern "false or fraudulent" claims. *See* 31 U.S.C. § 3729(a); *see also McKenzie,* 123 F.3d at 944; *Childree,* 92 F.3d at 1145; *Hopper,* 91 F.3d at 1269.

■ There was more than enough evidence for a reasonable juror to conclude that Yesudian was engaged in such an investiga-

tion. He repeatedly advised Parker's superiors that he had evidence Parker falsified time and attendance records, provided inside information to favored vendors to aid them in the bidding process, accepted bribes from vendors, permitted payments to vendors who did not provide services to the University, and took University property home for personal use. Vice President Jones asked him to provide "more specific information regarding these charges . . . so that they can be properly investigated." Def's Ex. 43. Yesudian collected evidence from other employees to corroborate the claim that Parker's assistant had not worked the days for which she received credit. *See* App. 56–57, 161–62. He also took photographs of University property he believed Parker had taken for personal use. And he collected further documentation which he provided to Vice President Fletcher. *See* App. 75.

Moreover, Yesudian knew that 80% of Howard's money came from the United States Government. Hence, even if resubmission of a false claim to the federal government were required for a successful action, the 80% figure gave Yesudian a good faith basis for going forward at the time of the retaliation. Given the information he had about Howard's finances, it would have been reasonable to conclude there was a "distinct possibility" he would find evidence of resubmission of the claims. Indeed, that is the kind of information a plaintiff normally cannot acquire until he files a suit and obtains the benefits of court-sanctioned discovery. Yet, as we have noted, such filing is not required to gain the protection of the statute. *See* 31 U.S.C. § 3730(h) (providing protection for an "investigation for . . . an action filed or to be filed").

The fact that Yesudian may have failed to find such evidence in the end means only that—if such evidence were necessary to prove a False Claims Act case—he ultimately would not be entitled to recover on his qui tam claim. Indeed, it is only one of many ways he could come up short. But there is no requirement that to be protected, a plaintiff must have gathered all of the evidence by the time of the retaliation. Indeed, if there were, the failure of Yesudian's contempora-

neous qui tam claim would alone have warranted judgment as a matter of law on his retaliation claim—yet neither the district court nor the defendant have taken that position.

■ Nor was it necessary for Yesudian to "know" that the investigation he was pursuing could lead to a False Claims Act suit. *See Childree*, 92 F.3d at 1143, 1145–46 (noting that employee never considered bringing False Claims Act case and had not heard of Act at time of discharge); *Hopper*, 91 F.3d at 1269 (protected activity does not require "[s]pecific awareness of the FCA"); *Neal*, 33 F.3d at 864 (noting that plaintiff was not informed that she could file a qui tam action). An initial investigation may well further an action under the Act, even though the employee does not know it at the time of the investigation. Were that not the case, only lawyers—or those versed in the law—would be protected by the statute, as only they would know from the outset that what they were investigating could lead to a False Claims Act prosecution. There is no suggestion in the legislative history that Congress meant to extend protection only to lawyers, or to others only after they have consulted with lawyers.

It could be argued that the phrase "to be filed" in § 3730(h) refers to the plaintiff's intent—i.e., that an action "to be filed" means one contemplated at the time of the conduct. But the courts have read the phrase to mean the equivalent of an action that reasonably could be filed. *See Childree*, 92 F.3d at 1146 (where the filing of an action was a "distinct possibility"); *Hopper*, 91 F.3d at 1269 (where the plaintiff is investigating matters that "reasonably could lead" to an FCA action); *Neal*, 33 F.3d at 864 (where litigation is a "distinct possibility" or "could be filed legitimately").

More importantly, the "to be filed" language in § 3730(h) does not define protected conduct; it is simply part of the language that describes examples of what is "includ[ed]" within that category. *See* 31 U.S.C. § 3730(h) ("acts done ... in furtherance of an action under this section, *including* investigation for ... an action filed or to be filed") (emphasis added). There is no indication that Congress intended the examples to encompass the entire category. *See McKenzie*, 123 F.3d at 944 ("The statute provides examples of the types of activity that are protected, including investigation, initiation of a suit, and testimony, but these examples are not exclusive and the legislative history indicates that '[p]rotected activity should ... be interpreted broadly.'") (quoting S. Rep. No. 99–345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300) (omission in original).[9] The protected conduct itself is simply "acts done ... in furtherance of an action under this section," and even an investigation conducted without contemplation of—or knowledge of the legal possibility of—a False Claims Act suit can end up being "in furtherance" of such an action.

■ As our previous discussion makes clear, the district court was wrong in suggesting that Yesudian's activity was unprotected because he had not initiated a private suit by the time of his termination. The court was also wrong in suggesting that Yesudian's conduct was unprotected because he had not, as an alternative, "initiated a government investigation," *Yesudian*, 946 F.Supp. at 33. Although the statute does require a qui tam relator to serve a copy of his complaint on the government and to disclose material evidence and information to it, those requirements do not take effect until the relator files a complaint with the court. *See* 31 U.S.C. § 3730(b). Nothing in the statute suggests that any kind of earlier communication with the government—or with anyone outside of his employing institution—

---

9. Indeed, several courts have said that internal reporting of false claims is itself an example of a protected activity. *See McKenzie*, 123 F.3d at 944; *Ramseyer*, 90 F.3d at 1523; *Robertson*, 32 F.3d at 951; *Mikes*, 889 F.Supp. at 752. And many courts, including this one, have held that internal reporting is sufficient to bring an employee within the protection of the whistleblower provisions of other federal statutes. *See, e.g., Phillips v. Interior Bd. of Mine Operations Appeals*, 500 F.2d 772, 778, 779 (D.C.Cir.1974) (Mine Safety Act); *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 931–33 (11th Cir.1995) (Energy Reorganization Act); *Passaic Valley*, 992 F.2d at 478–79 (3d Cir.1993) (Clean Water Act); *see also Passaic Valley*, 992 F.2d at 479 ("[O]ur sister courts of appeals have consistently construed [other] statutes to lend broad protective coverage to internal complainants.") (citing cases).

is required to satisfy the "acts in furtherance" requirement. *See McKenzie,* 123 F.3d at 944; *see also supra* note 9; *cf. Bechtel Constr. Co. v. Sec'y of Labor,* 50 F.3d 926, 932 (11th Cir.1995) ("[T]his interpretation [of the Energy Reorganization Act] ... avoids the unwitting consequence of preemptive retaliation, which would allow whistleblowers to be fired or otherwise discriminated against with impunity for internal complaints before they have a chance to bring them before an appropriate agency."). To the contrary, as Judge Easterbrook put it, "§ 3730(h) protects 'investigation' as well as reports of fraud, and an 'investigation' precedes communication." *Neal,* 33 F.3d at 865; *cf. NLRB v. Scrivener,* 405 U.S. 117, 121, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972) (construing National Labor Relations Act provision, protecting employee who "has filed charges or given testimony," as including "the investigative stage"). Indeed, in arguing the need for the 1986 whistleblower amendment, one of the prime examples noted by the Senate Judiciary Committee was the harassment of a Rockwell International employee after he told his supervisors he no longer would mischarge his time cards. *See* S. REP. NO. 99–345, at 5, *reprinted in* 1986 U.S.C.C.A.N. at 5270.

Nor would it be in the interest of law-abiding employers for the statute to force employees to report their concerns outside the corporation in order to gain whistleblower protection. Such a requirement would bypass internal controls and hotlines, damage corporate efforts at self-policing, and make it difficult for corporations and boards of directors to discover and correct on their own false claims made by rogue employees or managers. *Cf. Passaic Valley Sewerage Comm'rs v. Department of Labor,* 992 F.2d 474, 478–79 (3d Cir.1993) ("Employees should not be discouraged from the normal route of pursuing internal remedies before going public .... [as this] facilitate[s] prompt voluntary remediation and compliance with the Clean Water Act."); *Bechtel,* 50 F.3d at 931–33 (applying same analysis to Energy Reorganization Act).

In sum, we conclude that a reasonable juror could readily have found that Yesudian satisfied the first element of his retaliation claim against defendant Parker, by engaging in activity protected by the whistleblower provision of the False Claims Act.

### C

■ The district court also concluded there was no evidence to support the first part of the second element of Yesudian's retaliation claim—that defendant Parker knew Yesudian was engaged in protected activity.[10] This was so, the court said, because Yesudian "never suggested to defendant that he intended to utilize his allegations in furtherance of a False Claims Act action" and "gave no suggestion that he was going to report the alleged improprieties to government officials." *Yesudian,* 946 F.Supp. at 33.

But since there is no requirement that a plaintiff know his investigation could lead to a False Claims Act action, there likewise can be no requirement that he "suggest[ ] to defendant" that he is contemplating such an action. A plaintiff who need not even have heard of the False Claims Act can hardly be required to inform his supervisor that he "intend[s] to utilize his allegations in furtherance of" an action under that Act. Instead, the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged. What defendant must know is that plaintiff is engaged in protected activity as defined above—that is, in activity that reasonably could lead to a False Claims Act case. As already discussed, such activity includes the investigation of "false or fraudulent claims" made to federal grantees like Howard. But like the plaintiff, the defendant need not know, or be advised, that such claims would violate the False Claims Act itself. *Cf. Bryan v. United States,* —— U.S. ——, ——, 118 S.Ct. 1939, 1946, 141 L.Ed.2d 197 (1998) (charge of possession of unregistered machinegun requires proof that defendant knew weapon had the characteristics that brought it within statuto-

---

10. The district court did not find, and Parker does not contend, that there was no evidence to support the second part of this element: a show-ing that Yesudian was terminated in retaliation for his activity.

ry definition of machinegun, but not proof that defendant knew such possession was unlawful).

Indeed, requiring a plaintiff to advise his employer that he has filed or is contemplating filing a qui tam complaint would contravene the qui tam section of the Act itself, which dictates that such complaints be filed in camera, remain under seal for at least sixty days (extendable upon government motion), and "not be served on the defendant until the court so orders." 31 U.S.C. § 3730(b). The purpose of these provisions is to "protect the Government's interest in criminal matters" by enabling the government to investigate the alleged fraud without " 'tip[ping] off' investigation targets" at "a sensitive stage." S. REP. No. 99–345, at 24, *reprinted in* 1986 U.S.C.C.A.N. at 5289. To require a plaintiff to advise his employer of his intentions in order to enjoy whistleblower protection would frustrate this congressional concern.

For much the same reasons, there also is no requirement that a plaintiff tell, or threaten, his employer that he will report his allegations to the government—or to anyone outside of the employing institution. As the statute does not require the employee to make an outside complaint in order to render his conduct protected, he cannot be required to advise of or threaten such a complaint. Moreover, as with a requirement that an employee tell his employer he is contemplating filing a qui tam suit, a requirement that an employee announce he has gone outside the institution would undercut the statutory purpose of encouraging employees to expose fraud. *See id.* at 4–5, 34, *reprinted in* 1986 U.S.C.C.A.N. at 5269–70, 5299. Such an announcement necessarily creates the kind of adversary confrontation that mere internal reporting does not. And even though it may protect the employee from termination, it would also end any hopes he may have for normal advancement as a "loyal" employee. Many an employee may well decide that kind of protection is not worth obtaining, and so forego an investigation altogether. *See Mikes v. Strauss,* 889 F.Supp. 746, 753 (S.D.N.Y.1995) ("To insist upon an express or even an implied threat of such action would impose a requirement which is wholly unrealistic in an employment context.").

Nonetheless, a plaintiff still must show that his employer was aware of his protected activity. Merely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement—just as it does not constitute protected activity in the first place. Threatening to file a qui tam suit or to make a report to the government, on the other hand, clearly is one way to make an employer aware. But it is not the only way.

The steps Yesudian took in this case were sufficient for a reasonable juror to conclude that Parker was on notice Yesudian was engaged in protected activity. Yesudian repeatedly told Parker's superiors that Parker had falsified time and attendance records, accepted bribes from vendors, provided inside information to favored vendors, permitted payments to vendors who did not provide services, and taken University property home for personal use. A juror could reasonably conclude that Parker's superiors advised him of these charges, particularly since they told Yesudian they intended to investigate them. A juror could also conclude that the charges—many in the form of letters from Yesudian to University officials—would have been made available to Parker. And a reasonable juror could reach a similar conclusion from the timing of at least one incident in which Parker disciplined Yesudian, assertedly for insubordination, shortly after Yesudian made a complaint against him. *See* App. 58–60.

Indeed, there was even some evidence that Parker may have thought Yesudian actually was planning a qui tam case. On December 20, 1989, Parker's deputy, Varghese, sent Yesudian a disciplinary letter, complaining that "during work hours you went throughout the department taking photographs claiming that you may need these documents to support your case." App. 310. Although the letter does not explain which "case" Varghese was concerned about, the only photographs otherwise mentioned in the record are ones Yesudian took of University property he said Parker had taken home for his personal use. *See* App. 536. A reasonable juror could conclude that Parker knew of his deputy's letter and concerns.

Finally, the incident involving Yesudian's meeting with Vice President Fletcher, and the subsequent confrontation Yesudian had with Parker and Varghese, provides direct evidence that Parker was aware of Yesudian's protected activities. As noted above, in March 1992 Yesudian met with Fletcher, told him of his findings, and gave him a packet of documents he said supported the claims. *See* App. 74–75. Within a month, Parker called Yesudian into his office and read him verbatim the allegations Yesudian had made against Parker in the documents Yesudian had given Fletcher. Varghese then warned Yesudian: "[I]f you do this kind of stuff, you're not going to be in this department." App. 80. After the meeting, Yesudian reported the threats to Fletcher. A reasonable juror could readily have concluded from Yesudian's account of these events, as well as from the other incidents discussed above, that Parker knew his subordinate was engaged in protected activity.

Neither *United States ex rel. Hopper v. Anton,* 91 F.3d 1261 (9th Cir.1996), nor *Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948 (5th Cir.1994), cited by Parker, is to the contrary. The plaintiff in *Hopper* was a special education teacher who complained that her school district was failing to comply with federal and state laws pertaining to the handling of special education children. But she made no allegations of fraud. "[U]nless the employer is aware that the employee is investigating fraud," the court said, "the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)." *Hopper,* 91 F.3d at 1269.

The plaintiff's case in *Robertson* had both the same weakness as Hopper's and an additional one. The plaintiff in *Robertson,* a contract administrator employed by Bell Helicopter, became concerned about a "lack of verification" for maintenance and repair charges Bell was making on a government contract. *See* 32 F.3d at 949–50. He reported his concerns to his superiors and sought to substantiate the charges by requesting additional information from Bell managers. Although the court recognized that internal reporting has been held to constitute protected activity, it distinguished Robertson's internal reports because—like the plaintiff in *Hopper*—he had not told his employer he was concerned about possible fraud. *See id.*

Robertson also argued that his investigation into the substantiation for the maintenance charges constituted protected activity. In response, Bell noted a second problem. It contended it had no way to know Robertson's investigation was protected activity because substantiating charges was part of his job as a contract administrator. The court agreed. Because "Robertson never characterized his concerns as involving illegal, unlawful, or false-claims investigations.... [,] Robertson [never] expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job." *Id.* at 952.

The plaintiff in *United States ex rel. Ramseyer v. Century Healthcare Corp.* also had both of the problems of the *Robertson* plaintiff. Like Robertson (and Hopper), Ramseyer complained to her employer only of regulatory "non-compliance" and "shortcomings." And like Robertson, the weakness of her case was exacerbated by the fact that "the monitoring and reporting activities described in plaintiff's complaint were exactly those activities plaintiff was required to undertake in fulfillment of her job duties." 90 F.3d at 1523. As did the *Robertson* court, *Ramseyer* "acknowledge[d] that intracorporate complaints may fall within the protective scope of section 3730(h)." *Id.* But given that those complaints were indistinguishable from the reporting expected as part of her job, the court held she had to do something more to "make clear [her] intentions of bringing or assisting in [a False Claims Act] action *in order to overcome the presumption* that [she was] merely acting in accordance with [her] employment obligations." *Id.* at 1523 n. 7 (emphasis added).

Yesudian's case did not have these weaknesses. First, the nature of Yesudian's charges could not have been mistaken for a complaint about mere regulatory compliance. He asserted a classic false claim by contending that Parker was "falsifying" time and attendance records so that his assistant would be paid for work she did not do. He effectively charged Parker with defrauding Howard by taking bribes from vendors, providing them with inside information to aid

them in the bidding process, and permitting payments to vendors who did not provide services to the University. He further charged that Parker had converted University property to his personal use. Vice President Jones characterized the false statement charge as a charge of "cooperating in the cheating of the University with the Time and Attendance Records." Def.'s Ex. 43. Yesudian himself characterized the complaints as charges of "corruption" and "corrupt practices." App. 220.

Second, Yesudian's duties at the University did not include oversight of Purchasing Department operations, monitoring of other employees' time and attendance records, or tracking the use of University property. Thus, his investigation and complaints regarding falsification, bribery, and corruption could not have been mistaken for routine actions in accordance with his employment obligations. To the contrary, the trial record indicates that Yesudian's supervisors knew of and were distressed by his whistleblowing activities: according to Yesudian, Parker and Varghese threatened him for bringing to light "the corrupt practices and inefficiencies extant in the department." App. 220. Hence, unlike the plaintiffs in *Robertson* and *Ramseyer*, he had no "presumption" to overcome.

We conclude that a reasonable juror could have found that Yesudian engaged in activity protected by the False Claims Act, and that defendant Parker knew of that protected activity. We therefore reverse the grant of judgment as a matter of law on Yesudian's retaliation claim.

**IV**

 Yesudian also asserted claims against Howard based on breach of contract and promissory estoppel. He alleged that the Howard University Employee Handbook constituted a contract between him and the University, that he had relied upon it to his detriment, and that he had been fired in derogation of its provisions limiting the bases upon which, and the procedures through which, an employee could be terminated. Af-

ter the jury returned a verdict for Yesudian, Howard moved for judgment as a matter of law on the ground that there was no contract or reliance,[11] arguing that: (1) the Handbook contained a disclaimer which, as a matter of law, prevented any statement it contained from rising to the level of a binding obligation; and (2) even if it could constitute a binding obligation, Yesudian had given no additional consideration for the promises he alleged it contained and had not relied upon them to his detriment. The district court held that "[g]iven the contradictory language of the manual provisions, ... the issue of whether the employee manual constituted a contract was an issue for the jury[,]" and that "the jury was justified in finding that plaintiff reasonably relied on the provisions of the employee handbook to his detriment in that he followed the handbook grievance procedures at the expense of much time and money." *Yesudian*, 946 F.Supp. at 35–36. We concur with the conclusion of the district court for these and additional reasons.

 All parties agree that this issue is governed by District of Columbia law. Last year, in *Sisco v. GSA National Capital Federal Credit Union*, 689 A.2d 52, 55 (D.C. 1997), the District of Columbia Court of Appeals summarized District law on the subject. The presumption in the case of an employee like Yesudian—who lacks an express employment contract for a specified time—is that he is an employee at-will who may be fired at the employer's discretion. *See id.* at 53; *Nickens v. Labor Agency*, 600 A.2d 813, 816 (D.C.1991). An employee manual, however, overcomes the at-will presumption "where it set[s] forth a distinction between probationary and permanent employees, providing that the first could be discharged summarily but the latter only .... [after] 'specific preconditions had [been] met.'" *Sisco*, 689 A.2d at 54 (quoting *Washington Welfare Ass'n v. Wheeler*, 496 A.2d 613, 615–16 (D.C.1985)). "[S]uch manuals," the court said, "generally create 'a factual question for the jury' as to the existence of a contract." *Id.* (quoting *Nickens*,

---

11. Howard does not argue it was entitled to judgment as a matter of law on the ground that it

complied with the Handbook's requirements.

600 A.2d at 817); *see also Washington Welfare Ass'n*, 496 A.2d at 615.

The Handbook at issue here meets the *Sisco* test. As the district court—writing before *Sisco* was handed down—found, the Handbook expressly "distinguishes between temporary and probationary employees on the one hand, and regular employees, such as the plaintiff here, on the other." *Yesudian*, 946 F.Supp. at 35. The Handbook makes clear that the latter can be discharged only for cause and after specified procedures:

> Temporary and Probationary Employees may be terminated at any time their services are found to be unsatisfactory, or not in the best interests of the University.... *However*, in the case of Regular employees, termination on grounds of unsatisfactory work performance is in order *only* when employees fail to make satisfactory work improvement within thirty (30) calendar days after their supervisors have given them written notice of warning.... Charges against an employee of serious neglect of duty or conduct incompatible with the welfare of the University *must be substantiated* by the supervisor. Failure of the employee to refute successfully such charges constitutes grounds for dismissal.

Howard University Employee Handbook (Non–Faculty) § 1.11 (Apr. 1, 1980) (App. 638) (emphasis added). The Handbook also sets out a detailed grievance procedure to which employees in Yesudian's status are "entitled" whenever a complaint alleges "a violation, misapplication or misinterpretation of applicable rules, regulations, policies, laws, or orders resulting in an actual or anticipated unfair or unreasonable personnel procedure." *Id.* § 1.16; *see Yesudian*, 946 F.Supp. at 35 & n. 4. Indeed, the District of Columbia Court of Appeals has twice held that juries could find Howard University employee handbooks to constitute employment contracts.[12]

Notwithstanding these provisions, the University contends the Handbook cannot be considered a contract because it contains two other provisions that constitute ef-

fective disclaimers of any binding obligations. First, the Handbook states that "[t]he University reserves the right unto itself to maintain exclusive discretion to exercise the customary functions of management including, but not limited to, the discretion to select, hire, promote, demote, ... [or] terminate...." Handbook § 1.15. Second, the Handbook states that "[t]his document is not to be construed as a contract." *Id.* at ii.

*Sisco* governs these contentions as well. It holds that promises meeting the test described above—those "that are clear enough in limiting the right to terminate to specific causes or events"—effectively *"reverse* the normal presumption: to make them unenforceable at law, a manual purporting to restrict the grounds for termination must contain language *clearly* reserving the employer's right to terminate at will." *Sisco*, 689 A.2d at 55 (emphasis added).

The Handbook's reservation of management rights does not satisfy the *Sisco* standard for rebutting the reverse presumption. The employee manual at issue there similarly reserved management's rights "to discipline or discharge employees for any other cause," yet the court found this provision "insufficient to overcome the assurance conveyed by an objective reading of the entire document that termination will be governed by its terms." *Id.* The *Sisco* court also rejected the argument "that the employer's reserved right to modify the manual's terms unilaterally tends to show that any 'offer' made by the [employer] in distributing the manual was illusory." *Id.* at 57 (internal quotation omitted) (alteration in original). The employee's reasonable expectation of performance by the employer continues, the court said, "so long as the employer does not revoke the manual or disclaim its binding character." *Id.* As the district court found here, "the provisions in the handbook relating to termination of employment are phrased in such a manner as to lead an employee to believe that the University does not have unfettered discretion in its termination deci-

---

**12.** *See Howard Univ. v. Baten*, 632 A.2d 389, 390 (D.C.1993); *Law v. Howard Univ., Inc.*, 558 A.2d 355, 356 & n. 1 (D.C.1989). Because at oral argument both parties stated they were uncertain whether the handbook at issue here was the

same as that at issue in *Law*, we do not consider whether the doctrine of offensive collateral estoppel would otherwise be applicable. *See generally Jack Faucett Assocs. v. American Tel. & Tel.*, 744 F.2d 118, 124–26 (D.C.Cir.1984).

sions," despite the reservation of rights clause. *Yesudian*, 946 F.Supp. at 35.

■ The Handbook's statement that "[t]his document is not to be construed as a contract" also fails to meet the *Sisco* standard. Although it states an ultimate conclusion, it does not "contain language clearly reserving the employer's right to terminate at will," which *Sisco* requires to make the promises of a Handbook like this "unenforceable at law." *Sisco*, 689 A.2d at 55. In fact, "[n]owhere does the manual state that a 'Regular employee' may be terminated at will." *Yesudian*, 946 F.Supp. at 35. In each of the District of Columbia cases in which a disclaimer of contract status has been held to negate the inference of a binding obligation from an employee handbook, the disclaimer has stated *both* that the manual is not a contract *and* that employees may be terminated at will.[13] Although the District of Columbia Court of Appeals has not yet decided a case involving a disclaimer lacking the latter provision, numerous other courts have held disclaimers insufficient to keep cases from juries where they denied the existence of a contract but failed expressly to advise employees they could be terminated at will.[14] Given *Sisco*'s insistence that to overcome the reverse presumption in a case like this, the disclaimer "must contain language clearly reserving the employer's right to terminate at will," *Sisco*, 689 A.2d at 55, we conclude the District of Columbia Court of Appeals would reach the same result.

Moreover, as the district court pointed out, the same paragraph of the Handbook that says it is not to be construed as a contract also says the Handbook is "intended to promote a better understanding of what staff employees can *expect* from the University and what the University can expect from them in return." Handbook at ii (emphasis added). These two statements are, as the district court found, "contradictory." *Yesudian*, 946 F.Supp. at 35. When taken together with the other provisions of the Handbook that clearly limit Howard's right to terminate "to specific causes or events," *Sisco*, 689 A.2d at 55, the disclaimers asserted by Howard do no more than produce the kind of ambiguity that creates a jury question as to whether the Handbook constitutes "a promise of continued employment to [regular] employees terminable only for cause in accordance with its provisions," *id.* at 56.

13. See *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 627 n. 3 (D.C.1997) ("The employee handbook expressly states that it is not an employment contract *and* that 'nothing in this Handbook is intended to affect the "at-will" employment relationship.' ") (emphasis added); *Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 269 n. 1 (D.C.1993) ("This handbook is ... not an *employment contract and does not* guarantee any fixed terms and conditions of employment.... Employment for management personnel is for no definite period [and] is terminable at will....."); *Goos v. National Ass'n of Realtors*, 715 F.Supp. 2, 4 (D.D.C.1989) ("This handbook does not constitute an employment contract.... As an employee ... you are considered to be an employee-at-will.").

14. See, *e.g., Jones v. Central Peninsula Gen. Hosp.*, 779 P.2d 783, 787–88 (Alaska 1989) (finding inadequate a disclaimer providing that manual "is not a contract of employment," but "not appris[ing] the employee that his or her job is 'terminable at the will of the employer with or without reason' "); *Perman v. ArcVentures, Inc.*, 196 Ill.App.3d 758, 143 Ill.Dec. 910, 554 N.E.2d 982, 985, 987 (1990) (finding that "language in [employer's] manual of personnel policies and procedures created enforceable contractual rights despite its disclaimer" that the manual did "not constitute an employment contract"); *Pres-*

*ton v. Claridge Hotel & Casino, Ltd.*, 231 N.J.Super. 81, 555 A.2d 12, 15 (1989) (finding inadequate a disclaimer stating that handbook was "not intended to create, nor should [it] be construed to constitute, a contract of employment," and holding that "if [employer] wished to advise its employees that they could be discharged at will, such a warning should have been set forth expressly"); *Russell v. Board of County Comm'rs*, 952 P.2d 492, 503 (Okla.1997) ("While the manual states that ... the personnel policies do not represent an 'employment contract,' conflicting inferences may be drawn from other statements made in the same handbook."); *Johnson v. Nasca*, 802 P.2d 1294, 1295–97 (Okla. Ct.App.1990) (finding insufficient a disclaimer providing that employee handbook "should not be considered a contract" and that employer "reserves the right at any time to take any action it deems necessary in its sole discretion"). See *generally* Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers*, 13 INDUS. REL L.J. 326, 353 (1992) ("[S]uch a disclaimer is unclear because it speaks in terms of the technicalities of contract status without plainly stating the practical impact of the disclaimer on apparent promises of job security contained elsewhere in the handbook.") (citing *Preston*, 555 A.2d at 15).

We also cannot ignore the fact that in its answer to Yesudian's complaint, Howard actually conceded that the Handbook constituted a contract. *Compare* Compl. ¶ 31 *with* Answer ¶ 31. Ordinarily, we would consider such a concession in a pleading to constitute a binding judicial admission which Howard could not contradict either at trial or on appeal. *See Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir.1995); MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 6726 (interim ed.1992). Here, however, Yesudian failed to note Howard's admission or otherwise object when Howard did contest the point at trial. Under such circumstances, the Ninth Circuit has found one in Yesudian's position to have waived the argument that the issue was conclusively settled. *See American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir.1988). Because Yesudian's claim that the Handbook was a contract survives a motion for judgment as a matter of law under *Sisco* in any event, we do not need to decide whether there was a waiver here. We do note, however, that Howard's admission may have misled Yesudian into thinking he did not need to put anything more into evidence than the Handbook itself in order to establish that he had a contract.

 Howard also contends that because Yesudian gave no consideration for the Handbook's promises, no binding obligation was created. This argument is also foreclosed by *Sisco*, which held that "remaining with an employer after receipt of a personnel manual promising job security supplies the necessary consideration to make the promise legally enforceable." *Sisco*, 689 A.2d at 56.[15] Because Yesudian testified that he remained with Howard after receiving the Handbook, he satisfied the *Sisco* requirement. Accordingly, even without adding in Yesudian's detrimental reliance on the grievance procedures noted by the district court, we conclude that the Handbook's promises were supported by adequate consideration and that the district court properly denied Howard's motion for judgment as a matter of law.

### V

For the foregoing reasons, we reverse the district court's grant of judgment as a matter of law on Yesudian's retaliation claim and affirm the district court's denial of judgment as a matter of law on Yesudian's claim for breach of contract.

### KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting in part:

The district court's Rule 50 judgment on Yesudian's False Claims Act retaliation claim should be affirmed because Yesudian never produced evidence to show, as the majority acknowledges he must, "that his employer was aware of his protected activity." Maj. Op. at 743. Such a showing requires a plaintiff to have put the employer on notice not only that he is investigating fraud but also that the fraud is *against the federal government*, so as to potentially support a *qui tam* suit or a direct suit by the government. *See United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.*, 123 F.3d 935, 944 (6th Cir.1997) (" '[A]n employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a *qui tam* action against it.' ") (quoting *Mikes v. Strauss*, 889 F.Supp. 746, 753 (S.D.N.Y.1995)) (alteration by *McKenzie* court); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994) (employee must put the employer on notice that he is "concerned about the company defrauding the government"); *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir.1996) ("When seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government."); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269–70 (9th Cir. 1996) (concluding school principal who repri-

---

**15.** Under District of Columbia law, Yesudian did not need to introduce evidence that he had read the Handbook. *See Nickens*, 600 A.2d at 817 n.

**2.** The fact that Yesudian followed the Handbook's grievance procedures, however, suggests that he had in fact read it.

manded teacher did not have requisite "retaliatory intent" because even if she knew of teacher's complaints to California Department of Education, teacher "never gave any indication she was investigating the School District for defrauding the federal government"). Because Yesudian offered no evidence that he put his employer on such notice, I dissent from the majority's reversal of the district court's False Claim Act judgment.