Lydia D. SISCO, Appellant,

v.

GSA NATIONAL CAPITAL FEDERAL CREDIT UNION, Appellee.

No. 95–CV–1760.

District of Columbia Court of Appeals.

Argued Jan. 7, 1997.

Decided Feb. 6, 1997.

James B. Miles, Little Rock, AR, for appellant.

David W. Buckley, with whom Kristin T. Landis was on the brief, Washington, DC, for appellee.

Before FERREN, SCHWELB, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Appellant (Sisco) was fired from her job when she refused to come to work one snowy day in December 1993. She sued for wrongful termination under what she contends was a contract between herself and appellee (hereafter the Credit Union) setting forth specific conditions for discipline and discharge. The trial court, concluding that the Credit Union's Policy Manual created no such contractual relationship as a matter of law, granted summary judgment to the Credit Union. This appeal presents two questions. First, were the terms of the Policy Manual enough, for purposes of summary judgment, to overcome the traditional presumption of at-will employment in the case of an employee, like Sisco, who had no other contractual right to continued employment? And, if so, was the promise of job security contained in the Policy Manual supported by adequate consideration? *See Rinck v. Association of Reserve City Bankers,* 676 A.2d 12 (D.C.1996). We answer both questions affirmatively, and therefore reverse.

## I.

Sisco began working as a loan processor for the Credit Union in 1985, and was promoted to head teller two years later. Beyond a ninety-day probation period, there were no formal terms of her employment during this time. In March 1988, the Board of Directors of the Credit Union adopted a written Policy Manual intended to "act as a guide for everyone in the organization." In her affidavit opposing summary judgment, Sisco asserted that at that time the Credit Union's "manager gave us the manual at a staff meeting[,] . . . told us that the manual is our 'bible,'" and stated that it "would answer all questions about our job, [that] we should read it to answer anything we wanted to know, and that if we lost it we would have to pay a cost."

The Policy Manual states at the beginning that "[i]t is clearly understood that the board [the Board of Directors] alone is responsible for setting policy," and that the manual "becomes the policy of the new board" only after adoption annually by the newly constituted board. Sisco does not dispute that the Board adopted the Policy Manual unilaterally without input from the Credit Union's employees, and that the Board could revise or discontinue use of it at any time without consent of the employees.[1]

The record contains only portions of the Policy Manual, and our review is limited to those parts. Under the heading "Part III—Personnel," the manual has a section entitled "Probation," which states that "[b]oth management and staff are to be employed on a 90

---

1. The parties agree that there is a factual dispute, not resolvable by summary judgment, as to whether the Policy Manual was still in effect at the time of Sisco's firing.

day management probationary period" and that "[t]he manager [2] serves at the pleasure of the board of directors." During the probationary period "an employee may be dismissed without recourse, if that employee is a new employee." Upon "successful completion of probation, an employee shall receive a step increase."

At the center of this dispute is section 17, "Discharge or Discipline." It contains a "guide to progressive discipline," which is invoked only after a supervisor has made less formal efforts to resolve problems of unsatisfactory work or inefficient use of time by an employee. If "progressive discipline" is necessary, the manual provides that it "shall be handled as follows":

1) 1st offense. Written reprimand with or without suspension, up to three work days.

2) 2nd offense. Written reprimand with or without suspension, up to five work days.

3) 3rd offense. Discharge (this applies if first two reprimands accumulate within a twelve-month period for similar offenses). Where third offense does not result in discharge, reprimand with or without five days suspension.

4) 4th offense. Discharge when four offenses of differing nature occur within a twelve-month period.

The Policy Manual goes on to enumerate twenty-nine "causes for progressive disciplinary action," including unexcused absence and refusal to accept a job assignment, but adds that these reasons "shall not be deemed to exclude the credit union's right to discipline or discharge employees for any other cause." The manual also enumerates eleven acts of a more serious nature, including misappropriation of funds, falsifying records, and insubordination, and provides as to these:

> An employee will be temporarily suspended without pay if there are reasonable grounds to believe that any of [these] acts have been committed. Conclusive proof shall result in immediate discharge effective from the time of suspension. If

charges are not proven, the employee will be reinstated with full back pay.

In her affidavit, Sisco asserted that some time in 1993 she "was told by an official of [the Credit Union, a Mrs. Daisey Graham,] that I have a right to file a grievance based on the 'policy book.'"

## II.

This is not the first time the court has considered whether an employer personnel or policy manual, by its terms and the manner of its distribution, served to create a jury issue regarding whether an otherwise at-will employment relationship gave way to an implied contract limiting the right to discharge. Our first case dealing directly with the issue, *Washington Welfare Ass'n, Inc. v. Wheeler*, 496 A.2d 613 (D.C.1985), held that such a manual overcame the at-will presumption, for directed verdict purposes, where it set forth a distinction between probationary and permanent employees, providing that the first could be discharged summarily but the latter only "for good cause so long as the project to which [the employee] is assigned remains funded." *Id.* at 615 (footnote omitted). We stated broadly:

> An employer's personnel manual is evidence of the terms and conditions both employer and employee accept as part of the agreement.... Whether a personnel manual creates contractual rights for the employee is a question for the jury.... [T]he Manual [here] evidences intent of the parties that specific preconditions had to be met before employment could be terminated....

*Id.* at 615–16. In *Nickens v. Labor Agency of Metro. Wash.*, 600 A.2d 813 (D.C.1991), we quoted *Wheeler* on the point that such manuals generally create "a factual question for the jury" as to the existence of a contract. *Nickens*, 600 A.2d at 817 (quoting *Wheeler*, 496 A.2d at 615). In reversing summary judgment for the employer, we pointed to, among other things, the requirement in the personnel manual there that all staff members be given a copy and acknowledge receipt in writing, and to the specific terms of

---

**2.** Elsewhere the "manager" is defined as "the principal operating officer of the credit union."

Sisco, although the head teller, was not the manager.

the manual which, without expressly saying so, "provide[d] for termination only under ... conditions" set forth therein. 600 A.2d at 817.

In two other decisions, by contrast, we have found language present in the personnel manual negating the inference of an implied contract. In *Elliott v. Healthcare Corp.*, 629 A.2d 6 (D.C.1993), the manual expressly reserved the rights both of the employee "to leave at any time for any reason" and of the employer "to terminate an [e]mployee at any time for any reason." *Id.* at 8 n. 2. And in *Perkins v. District Gov't Employees Fed. Credit Union*, 653 A.2d 842 (D.C.1995), language reserving the management's right "in their discretion" to invoke any or none of specified procedures for termination made the personnel manual too ambiguous to overcome the presumption of at-will employment. *Id.* at 843.

Finally, in *Rinck*, 676 A.2d at 16, we again cited *Wheeler* for the principle that "a personnel manual that states specific preconditions that must be met before employment will be terminated is sufficiently clear to rebut the presumption of at-will employment." We found "analogous" to such written statements an oral promise by the employer's executive director that the plaintiff-employee would not be fired as a result of a planned merger. *Id.*

■ All told, we think the teaching of these decisions is that assurances by an employer in a personnel or policy manual distributed to all employees that are clear enough in limiting the right to terminate to specific causes or events will overcome the presumption of at-will employment. Such a promise, if supported by adequate consideration, *Rinck*, 676 A.2d at 16–17; see part III, *infra*, creates a triable issue of fact as to the existence of an implied contract for continued employment. In effect, promises meeting this test reverse the normal presumption: to make them unenforceable at law, a manual purporting to restrict the grounds for termination must contain language clearly reserving the employer's right to terminate at will. We look to both the terms of the manual and the manner of its distribution to determine whether a jury issue is presented.

■ The Credit Union relies chiefly on the fact that the Policy Manual announces itself "as a *guide* for everyone in the organization" and describes the discharge or discipline provisions as a "*guide* to progressive discipline" (emphases added). It further points to the manual's reservation of "the credit union's right to discipline or discharge employees for *any other cause*" (emphasis added) than the twenty-nine enumerated. These provisions, we hold, are insufficient to overcome the assurance conveyed by an objective reading of the entire document that termination will be governed by its terms. First of all, the Policy Manual identifies specifically those who "may be dismissed without recourse": new probationary employees, of which Sisco was not one. At another point it states that, while both management and staff are to be employed on a ninety-day probationary period, "[t]he *manager* serves at the pleasure of the board of directors" (emphasis added). Section 17, while described as "the guide to progressive discipline," uses mandatory language in stating that informal steps "shall" be taken to correct a situation before instituting the guide, and that, once invoked, "[p]rogressive discipline shall be handled" in a carefully calibrated manner depending on which "offense" has been committed up to the fourth. While the then-enumerated offenses or "causes for progressive discipline" are "simply meant to be samples," the most natural reading of the reserved right to discipline or discharge "for any other cause" is that it means other causes for, or acts warranting, *disciplinary* action in accordance with the manual—not discharge for any or no reason at all. *See, e.g., Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 643 A.2d 546, 551 (1994) (agreeing with Appellate Division's conclusion that, although manual's list of terminable offenses was not exhaustive, "other grounds would be limited by the construction principle that they fall into the same class or category of violation"). Particularly instructive is the provision for temporary suspension followed by discharge or reinstatement with back pay in the case of the eleven especially serious offenses listed, requiring "reasonable grounds" for suspension but "[c]onclusive proof" for discharge. Such

careful reservation of the employer's right to act immediately to protect its interests, while at the same time shielding the employee from unproven charges by reinstatement and back pay, appears quite inconsistent with an unstated intent to reserve the right to fire for no reason at all.[3]

The definiteness of these job-security provisions perhaps makes it unnecessary to consider the circumstances of the manual's distribution, but they do not weaken Sisco's case. Although the procedures for its delivery to employees are not formally prescribed as they were in *Nickens*, 600 A.2d at 817, Sisco stated in her affidavit that the Credit Union's manager gave the manual to the employees in 1988 with instructions to treat it as their "bible" and safeguard it under pain of reimbursement for loss. And as late as 1993, Sisco was told by a named Credit Union "official" that she could file a grievance based upon the manual.

We conclude that a jury reasonably could find in the Policy Manual a promise of continued employment to nonprobationary employees, terminable only for cause in accordance with its provisions.

### III.

There is another step to the analysis, however. The Credit Union adopted (and periodically revised) the Policy Manual without any negotiation with the employees over its terms. Sisco concedes that the only consideration the employees provided in return for the promise of job security it contained was the loyal continuation of their services. The question we must answer is whether this was enough.

■■■ "Generally, consideration is necessary to make a promise enforceable." *Rinck,* 676 A.2d at 16 (citing Restatement (Second) of Contracts § 71 (1981)). "[I]f a promise of job security is made at the time the parties first enter into the employment contract, the consideration of the employee's services is undoubtedly sufficient to support the various obligations the employer undertakes, in-

cluding the job security provision." *Id.* (citing *Littell v. Evening Star Newspaper Co.,* 73 App.D.C. 409, 410, 120 F.2d 36, 37 (1941)). *Rinck,* however, like the present case, involved assurances of job security made to an employee who was already working, and so the question the court had to decide was "whether additional consideration beyond the continuation of services is required when a promise of job security is made *after* the commencement of employment." 676 A.2d at 17 (emphasis in original). The court held that where the employer's promise consists of oral statements "regarding job security . . . to an individual employee who is already working[,] . . . additional consideration beyond continued employment per se is required to make such a promise enforceable." *Id.*

■■■ The court in *Rinck,* however, expressly declined to decide whether that rule applied in the different setting where "an employer issues employee handbooks to those who had previously commenced employment." *Id.* Noting a division of authority elsewhere on the point, it nonetheless opined:

> Special factors are present in general personnel policy situations such as those involving employee handbooks. An employer, for example, may reasonably expect to benefit from better morale and a generally more cooperative attitude on the part of its entire workforce as a result of the promulgation of such a handbook. Moreover, enforcement of a handbook's provisions does not depend upon resolution of a fact issue created by an employee's recollection of a verbal exchange concerning such matters as the employer's right to terminate.

*Id.* at 17 n. 5 (dictum). We today decide the issue left open in *Rinck,* and hold that remaining with an employer after receipt of a personnel manual promising job security supplies the necessary consideration to make the promise legally enforceable.

First, as the final sentence of the quotation from *Rinck* implies, the need for additional

---

**3.** This case concerns only a discharge for reasons of discipline. We have no occasion to consider the bearing of the Policy Manual on terminations

occasioned, for example, by job reclassification or reduction in workforce.

consideration beyond work continuation in order to confirm the employer's intent to be bound is diminished when that intent is expressed in a written manual given to all employees which expressly treats matters of termination and discipline.[4] Moreover, also in keeping with the *Rinck* language, we do not agree that the consideration of remaining with the employer in return for job security assurances is insubstantial: by instituting a company-wide policy concerning discipline and discharge,

> [t]he employer secures an orderly, cooperative and loyal work force.... [T]he employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee.

*Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 292 N.W.2d 880, 892 (1980). Other courts likewise have found such "presum[ed] enhance[ment]" of the employment relationship, *id.*, adequate consideration to support an implied contract in the policy or personnel manual context. *See, e.g., Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1087 (1984) (en banc) ("[T]he principal, though not exclusive, reason employers issue such manuals is to create an atmosphere of fair treatment and job security for their employees"); *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 630 (Minn.1983) (employer receives "the advantages of a more stable and, presumably, more productive work force"); *Wagner v. Sperry Univac, Div. of Sperry Rand Corp.*, 458 F.Supp. 505, 520–21 (E.D.Pa.1978) (as consideration may be forbearance, plaintiff's decision not to seek employment elsewhere constituted sufficient consideration), *aff'd mem.*, 624 F.2d 1092 (3d Cir.1980); *Mobil Coal Producing, Inc. v. Parks*, 704 P.2d 702, 707 (Wyo.1985) (policy manual may induce employee to continue employment).[5]

■ The Credit Union argues, and it has been suggested, that the employer's reserved right to modify the manual's terms unilaterally "tends to show that any 'offer' made by the [employer] in distributing the manual was illusory." *Jackson v. Action for Boston Community Dev. Inc.*, 403 Mass. 8, 525 N.E.2d 411, 415 (1988). Yet so long as the employer does *not* revoke the manual or disclaim its binding character, it is not unreasonable to infer that he continues to value the benefits of stability and cooperativeness by the workforce flowing from increased job security. Those benefits thus fulfill the primary purpose of consideration, which is to "provide[ ] substantial evidence that the promisee's expectation of performance [by the employer] is reasonable." 2 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 5.3, at 20 (rev. ed.1995). As stated earlier, of course, by specific language in the manual the employer can negate the reasonableness of that expectation.

The order granting summary judgment is, accordingly,

*Reversed.*

---

**4.** *See Littell,* 73 App. D.C. at 410, 120 F.2d at 37 (where parties have not "clearly expressed" their intent to create employment contract, "evidence which shows other consideration than a promise to render services" is part of the "surrounding circumstances" courts "will look to ... to determine what was in the minds of the contracting parties").

**5.** The Credit Union, citing *Schoen v. Consumers United Group, Inc.,* 670 F.Supp. 367 (D.D.C.

1986), contends that the pre-existing duty rule prevents Sisco's continued employment from constituting additional consideration. *Id.* at 378 (citing *Murray v. Lichtman,* 119 U.S.App. D.C. 250, 339 F.2d 749 (1964) (promise to perform pre-existing duties not sufficient consideration to alter obligation)). This argument, however, is inapplicable in the context of at-will employment, where the employee has no pre-existing duty to continue employment.