Larry AUSTIN, Plaintiff,

v.

**HOWARD UNIVERSITY,
et al., Defendants.**

No. CIV.A. 01–1026(RBW).

United States District Court,
District of Columbia.

June 2, 2003.

Larry Austin, Washington, DC, pro se.

Phillip A. Lattimore, III, Howard University, Washington, DC, Alan S. Block, Bonner, Kiernan, Trebach & Crociata, Washington, DC, Sheila Anne Lowery-Ferguson, Chula Vista, CA, Juan Anderson, Washington, DC, for Howard University Hosp.

Stephen Walter Godoff, Baltimore, MD, for American Fed. of State, County and Mun. Employees (AFSCME), Local 2094.

## MEMORANDUM OPINION

WALTON, District Judge.

This matter is before the Court on defendant Howard University's motion for summary judgment.[1] Having considered defendant's motion, plaintiff's opposition, and the record in this case, the Court will grant the motion in part, and deny the motion in part.

### I. Background

Plaintiff Larry Austin worked in the Medical Records Department at Howard University Hospital from December 1987 until his termination on May 17, 1999. On May 3, 1999, plaintiff and Sharyl Van Hook,[2] a female co-worker, had a heated verbal altercation at their workplace, during which both parties traded insults. Plaintiff reported the incident to their immediate supervisor, Maria McIntosh. Plaintiff's Memorandum of Points and Authorities in Support of his Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n."), Ex. M (Deposition ("Dep.") of Maria McIntosh) at 47–48. Ms. McIntosh in turn informed her super-

Steven C. Kahn, Miller, Canfield, Paddock & Stone, P.L.C., Washington, DC, for Larry Austin.

1. In the accompanying Order, the Court will also issue its ruling on the parties' Joint Motion for Postponement of Pretrial Conference and Extension of Deadlines Prior to Pretrial Conference.

2. Ms. Van Hook's first name appears in the record with two different spellings—Sharyl and Cheryl.

visor, Terrie McCray, the Director of Medical Records, of the incident. *See id.*, Ex. N (Dep. of Terrie McCray) at 98–100. Ms. McIntosh requested and obtained written statements from Ms. Van Hook and other employees who witnessed the event.[3] *See id.*, Ex. B–C (May 3, 1999 statements of Sonya Blizzard and Dana Hill). Based on these accounts, Ms. McCray recommended disciplinary action for both plaintiff and Ms. Van Hook. Pl.'s Opp'n, Ex. D (Memorandum from Terrie McCray, Director, Medical Records, to Renee Turner Inman, Manager, Employee and Labor Relations, regarding recommendations for disciplinary action). Both plaintiff and Ms. Van Hook subsequently were terminated. *See* Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."), Ex. 2 (Dep. of Larry D. Austin) at 146, 150. Plaintiff received his termination letter on May 17, 1999. *See id.* at 76.

Plaintiff initially filed a *pro se* complaint in which he asserted a single claim of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (1999), and the District of Columbia Human Rights Act ("DCHRA"), D.C.Code § 2–1401.01 *et seq.* (2001). Howard University answered the complaint after its motion to dismiss was denied. Thereafter, the Court appointed counsel to represent plaintiff in this action. Counsel then filed an amended complaint in which he re-asserted the ADEA and DCHRA claims against Howard University (Counts V and VI respectively) and added claims against Howard University for breach of the collective bargaining agreement (Count I), breach of contract (Count III) and self-defamation (Count

IV). The First Amended Complaint also added a claim of breach of the duty of fair representation against the American Federation of State, County and Municipal Employees, Local 2094 (Count II). Thereafter, plaintiff voluntarily dismissed with prejudice Counts I, II, V and VI of the complaint. Accordingly, the only remaining claims are those for breach of contract and for self-defamation (Counts III and IV respectively) that have been filed against Howard University.

## II.  Discussion

### A.  Standard of Review

Summary judgment should be granted to the movant if it has shown, when the facts are viewed in the light most favorable to the non-movant, that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(c). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When evaluating a summary judgment motion, the Court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.; Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific

---

**3.**  Ms. McCray stated that she asked plaintiff for his written statement but she did not receive it. *See* Pl.'s Opp'n, Ex. M (Dep. of Terrie McCray) at 101, 108. Plaintiff, on the other hand, stated that no one requested his written statement. *See id.*, Declaration of Larry Austin, ¶ 4.

facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C.Cir.1996).

### B. Breach of Contract Claim

Plaintiff alleges that the Howard University Employee Handbook ("Handbook") constitutes an employment contract, and that his termination did not comply with its terms. *See* First Amd. Compl. ¶¶ 29–34. As a result, plaintiff claims that he suffered damages arising from the loss of employment, the loss of income, and the loss of other employment benefits. *See id.* ¶¶ 23, 34. Defendant counters that the Handbook, by its terms, is not an employment contract. Further, defendant argues in the alternative, that even if the Handbook is a contract, plaintiff's failure to avail himself of the grievance procedures set forth therein constitutes a waiver of any rights created by the Handbook.

If an employee is hired without an expressed term or duration for his employment, as was plaintiff, it is presumed that he is an at-will employee. *See Nickens v. Labor Agency of Metropolitan Washington*, 600 A.2d 813, 816 (D.C.1991); *see Washington Welfare Ass'n, Inc. v. Wheeler*, 496 A.2d 613, 616 (D.C.1985); *see Sullivan v. Heritage Foundation*, 399 A.2d 856, 860 (D.C.1979). Under District of Columbia law, an employer may discharge an at-will employee at any time for any reason. *See, e.g., Thigpen v. Greenpeace, Inc.*, 657 A.2d 770, 771 (D.C.1995). The at-will employment presumption may be rebutted "by evidence that the parties intended the employment to be for a fixed period, or subject to specific preconditions before termination." *Nickens*, 600 A.2d at 818 (citations omitted).

An employee handbook or personnel manual may provide evidence "of the terms and conditions both employer and employee accept as part of the [employment] agreement," and therefore rebut the at-will employment presumption. *Wheeler*, 496 A.2d at 615 (citing *Green v. District of Columbia Unemployment Compensation Bd.*, 273 A.2d 479, 480 (D.C. 1971)). In certain circumstances, provisions of an employee handbook or personnel manual may create contractual rights for an employee. *Strass v. Kaiser Foundation Health Plan of Mid–Atlantic*, 744 A.2d 1000, 1011 (D.C.2000). Whether an employee handbook creates contractual rights for an employee is a question for a jury. *See Yesudian v. Howard University*, 153 F.3d 731, 745 (D.C.Cir.1998); *see Wheeler*, 496 A.2d at 615.

A handbook or manual's express terms, however, may disclaim the creation of any contractual obligations. *See Strass*, 744 A.2d at 1012. Thus, an employer may include language in an employee handbook which expressly disclaims the creation of an implied contract. *See Roberts v. Howard University*, 740 A.2d 16, 19 (D.C.1999) (handbook did not apply to union member covered by collective bargaining agreement; in dicta, court noted handbook's terms declaring that it was not an employment contract); *see Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 269 (D.C.1993) (language stating that employee handbook "is not an employment contract" and reiterating employer's right to terminate management personnel "at will" effectively disclaimed an implied employment contract). However, the inclusion of a contractual disclaimer does not lead inevitably to the conclusion that an employer is relieved of any obligation to comply with the manual's terms. *See Strass*, 744 A.2d at 1012. The District of

Columbia Court of Appeals summarized its position on the subject, stating:

> All told, we think . . . that assurances by an employer in a personnel or policy manual distributed to all employees that are clear enough in limiting the right to terminate to specific causes or events will overcome the presumption of at-will employment. Such a promise . . . creates a triable issue of fact as to the existence of an implied contract for continued employment. In effect, promises meeting this test reverse the normal presumption: *to make them unenforceable at law, a manual purporting to restrict the grounds for termination must contain language clearly reserving the employer's right to terminate at will.*

*Sisco v. GSA National Capital Federal Credit Union,* 689 A.2d 52, 55 (D.C.1997) (emphasis added).

Howard University has an employee handbook which, among other things, addresses employment policies, employee benefits, compensation, and the University's Code of Conduct. *See* Pl.'s Opp'n, Ex. E (Handbook). Its introduction includes the following statement:

> This Handbook for Howard University staff employees (non-faculty, exclusive of students) . . . is a policy statement intended to promote a better understanding of what staff employees can expect from the University and what the University can expect from them in return. The provisions delineated in this Handbook are not applicable to employees who are covered by Collective Bargaining contracts, unless they are incorporated by reference in the respective contracts. This Handbook supercedes all previous Howard University Employee Handbooks for non-faculty staff, and is subject to revision(s) as needed. *This document is not to be construed as a contract.*

*Id.* at ii (emphasis added). The parties do not dispute that plaintiff was a regular staff employee[4] and that the Handbook applied to him.[5]

The University has "a discipline plan" for offenses "that normally warrant disciplinary action."[6] Pl.'s Opp'n, Ex. E (Handbook), Sec. 1.12. Counseling normally precedes the issuance of a written reprimand for minor offenses such as substandard performance or poor attendance. *Id.,* Sec. 1.12 B. An employee who does not respond favorably to counseling may be placed on probation. *Id.,* Sec. 1.12 C. An employee who does not respond favorably to the guidance provided during the probationary period may be terminated. *Id.* If the best interest of the University is

---

4. An employee whose appointment requires service of a trial period to demonstrate satisfactory work performance is designated as having a "probationary appointment." Pl.'s Opp'n, Ex. E (Handbook), Sec. 1.2 A. An employee who has completed his probationary period satisfactorily is designated as having a "regular appointment." *Id.,* Sec. 1.2 B.

5. Plaintiff was a member of the American Federation of State, County and Municipal Employees, Local 2094. First Amd. Compl. ¶¶ 2, 4. He challenged his termination pursuant to the terms of the collective bargaining agreement between Howard University and Local 2094 that was in effect at that time. *See* Pl.'s Opp'n, Ex. I–K (documents regarding plaintiff's official grievance process). The collective bargaining agreement was terminated effective April 1, 1999. *See id.,* Ex. A (Letter from Sherman P. McCoy, Executive Director, Howard University Hospital, to Stephen Godoff dated March 22, 1999). Although plaintiff pursued a remedy available to him under the collective bargaining agreement, plaintiff also believes that the Handbook applied to him. *See* Def.'s Mem., Ex. 2 (excerpts from Dep. of Larry D. Austin) at 71–74.

6. The Handbook itself does not list offenses "that normally warrant disciplinary action." *See* Pl.'s Opp'n, Ex. E (Handbook), Sec. 1.12.

served by an employee's immediate removal from his duty station, the employee may be suspended. *Id.*, Sec. 1.12 D. Suspension for disciplinary reasons may be appropriate as a less severe sanction than termination. *Id.* Sec. 1.12 D.2.

Section 1.11 of the Handbook governs the termination of Howard University employees. Termination of a regular employee "on grounds of unsatisfactory work performance is in order only when employees fail to make satisfactory improvement within thirty (30) calendar days after their supervisors have given them written notice of warning." *Id.,* Sec. 1.11 A. Termination of regular employees for conduct incompatible with the welfare of the university "may result in termination without prior notice." *Id.*, Sec. 1.11 A.2. "Charges against an employee of . . . conduct incompatible with the welfare of the University must be substantiated by the supervisor. Failure of the employee to refute successfully such charges constitutes grounds for dismissal." *Id.*, Sec. 1.11 A. The Handbook provides a non-exhaustive list of situations which are considered "Unsatisfactory Work Performance" and "Conduct Incompatible with the Welfare of the University." [7] *See id.,* Sec. 1.11 A.1 and A.2.

An employee who has been terminated may submit a written petition for a grievance hearing. *See* Pl.'s Opp'n, Ex. E (Handbook), Sec. 1.16 (Step 1: Grievance Hearing Process). He must initiate his grievance within 15 calendar days after acquiring notice of termination, "otherwise the right to avail [himself] of Grievance Procedures shall be deemed to have been waived by the employee[ ]." *Id.*, Sec. 1.16 D.

It is clear that plaintiff's supervisor referred to and relied upon the disciplinary provisions of the Handbook in the aftermath of plaintiff's altercation with Ms. Van Hook. *See* Pl.'s Opp'n, Ex. N (Dep. of Terrie McCray) at 64–65, 130, 138. In fact, language in that recommendation was copied directly from the Handbook. *Compare* Pl.'s Opp'n, Ex. D (memorandum recommending termination of Larry Austin and Cheryl Van Hook) and Ex. E (Handbook), Sec. 1.11. According to Ms. McCray's recommendation for disciplinary action, the stated reasons for plaintiff's termination were:

> unsatisfactory work performance, discourteous treatment of employees, students, patients, or visitors, and threatening, intimidating, coercing, or interfering with fellow employees on University property, which is Conduct Incompatible With The Welfare of the University.

Pl.'s Opp'n, Ex. D; *see* Pl.'s Opp'n, Ex. E (Handbook), Sec. 1.11 1.j., 1.11 2.h. The language of plaintiff's termination letter, however, does not appear to correspond directly to any language in the Handbook. In relevant part, the termination letter stated:

> [Y]ou are hereby terminated from your employment with Howard University Hospital as a result of the incident that occurred between you and Ms. Van Hook on May 3, 1999. The behavior exhibited was unprofessional, by leaving your work area, and allowing the argument to escalate to such a level. Such behavior is extremely disruptive to the workplace environment.[8]

Def.'s Mem., Ex. 4 (letter dated May 14, 1999 to plaintiff from Terrie McCray, Di-

---

7. The Handbook notes that, "[s]ince a complete listing of specific offenses is impossible, termination is not limited to the situations described above [in the lists of situations which are considered 'Unsatisfactory Work

Performance' and 'Conduct Incompatible with the Welfare of the University']". Pl.'s Opp'n, Ex. E (Handbook) at 10.

8. Plaintiff's termination may have been based in part on a so-called "no tolerance policy."

rector, Medical Records, Howard University Hospital); Pl.'s Opp'n, Ex. H (same).

In the Handbook, under the heading "Unsatisfactory Work Performance" the offense of "discourteous treatment of employees, students, patients, or visitors" is listed. *See* Pl.'s Opp'n, Ex. E (Handbook), Sec. 1.11 A.1. According to the Handbook, termination of a regular employee because of his unsatisfactory work performance is an offense for which written notice and a 30–day opportunity for improvement is required. *See id.,* Sec. 1.11 A. The other grounds indicated in Ms. McCray's recommendation, however, may result in termination without prior notice. For example, under the heading "Conduct Incompatible with the Welfare of the University" is listed the offense of "threatening, intimidating, coercing, or interfering with fellow employees on University property." *See id.,* Sec. 1.11 A.2.h. According to the Handbook, termination on this ground may occur after the charges against the employee are substantiated by his supervisor and the employee fails to refute such charges. *See* Pl.'s Opp'n, Ex. E (Handbook), Sec. 1.11 A. These Handbook provisions appear to impose conditions that must be satisfied when disciplining University employees. As such, the Handbook may be considered evidence "of the terms and conditions both employer and employee accept as part of the [employment] agreement." *Wheeler,* 496 A.2d at 615; *see Yesudian,* 153 F.3d at 745 (employee manual which distinguishes between probationary and permanent employees and which provides for discharge of permanent employees only after specific preconditions are met generally creates

factual question for the jury as to the existence of a contract). As already indicated, the existence of such conditions may rebut the presumption that plaintiff was an at-will employee of Howard University who could be terminated for any reason at any time.

The Handbook states that it is "not to be construed as a contract." Pl.'s Opp'n, Ex. E (Handbook) at ii. The inclusion of provisions which establish preconditions to the termination of a regular employee, however, suggests the opposite. Namely, a regular employee of Howard University may be terminated only for cause and after other measures are taken. It is therefore unclear whether the Handbook's purported contractual disclaimer, when considered in conjunction with the entire Handbook, effectively relieves defendant of any obligations to its employees pursuant to the provisions of its Handbook. *See Strass,* 744 A.2d at 1014; *see also Sisco,* 689 A.2d at 56. Defendant relied on language in the Handbook as support for its decision to terminate plaintiff, but apparently took no steps to satisfy the Handbook's preconditions for termination. Specifically, the record does not indicate that plaintiff received a written warning from his supervisor, enjoyed a period of time during which he could improve his performance, knew about the disciplinary charges lodged against him prior to receipt of his termination letter, or definitively demonstrated that he had an opportunity to refute those charges. Thus, there are genuine issues of material fact as to whether the Handbook constitutes an employment contract between the parties and, if so, whether plaintiff was terminated

However, no such policy appears to have been reduced to writing. In sustaining its decision to terminate plaintiff, defendant stated that "it will not tolerate inappropriate behavior, including but not limited to violence, verbal alterations with the use of profanity, and other major disruptions in the work-

place." Pl.'s Opp'n, Ex. J (Memorandum dated June 19, 1999 to Lauretta Stevenson, Shop Steward, Local 2094, from Renee J. Turner-Inman, Manager, Employee & Labor Relations Howard University Hospital, regarding Step 3 hearing) at 2.

in accordance with its terms. Accordingly, the Court will deny summary judgment on plaintiff's breach of contract claim. *See Nickens*, 600 A.2d at 818.

The fact that plaintiff did not demand a grievance hearing within 15 days after he received his termination notice, as required by the Handbook, does not persuade the Court that plaintiff waived any rights he may have pursuant to the Handbook. At the time of his termination, plaintiff believed that he was covered by a collective bargaining agreement. For this reason, shortly after receipt of his termination letter, plaintiff contacted the union, Local 2094, for the purpose of challenging his termination. *See* Def.'s Mot., Ex. 2 (Dep. of Larry D. Austin) at 71–74. A representative of Local 2094 represented plaintiff in the disposition of the official grievance he filed pursuant to the collective bargaining agreement between defendant and the union. *See* Pl.'s Opp'n, Ex. I–J. Moreover, it appears that defendant also believed that plaintiff was covered by the collective bargaining agreement, as evidenced by its participation in three stages of a four-part grievance process. *See* Pl.'s Opp'n, Ex. I–J. It was not until two months after plaintiff's termination that defendant objected to the continuation of the grievance process on the ground that the union's request for arbitration was not made until after the University terminated the collective bargaining agreement. *See id.*, Ex. K (Letter dated July 8, 1999 from Renee J. Turner–Inman, Acting Asst. Director, Human Resources, to American Arbitration Assoc.). By its terms, the Handbook does not apply to employees covered by a collective bargaining agreement. *See* Pl.'s Opp'n, Ex. E (Handbook) at ii. However, plaintiff's termination in May 1999 occurred after defendant terminated the collective bargaining agreement on April 1, 1999. *See* Pl.'s Opp'n, Ex. A, K. Therefore, it appears that when plaintiff was terminated, there was no collective bar-

gaining agreement in effect and that the provisions of the Handbook applied. Nonetheless, because the parties apparently were under the false impression that the collective bargaining agreement governed during the entire 15–day period after plaintiff's termination, during which a grievance pursuant to the Handbook had to be initiated, the Court cannot preclude plaintiff from pursuing his breach of contract claim due to his failure to avail himself of the grievance procedure set forth in the Handbook. *Cf. Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (plaintiff who fails to file employment discrimination claim within requisite time period may invoke equitable remedy to avoid bar if he demonstrates diligence in preserving his claim).

### C. Self–Defamation Claim

■ Plaintiff alleges that the statements in his termination letter are false and defamatory. *See* First Amd. Compl., ¶¶ 18, 36. In his search for employment following his termination, plaintiff alleges that he was forced to repeat the false and defamatory reasons for his termination to prospective employers. *Id.* Plaintiff thus claims that he was compelled to publish defamatory information about himself, and, as a consequence, he allegedly suffered damages including loss of employment, loss of income and other employment benefits, injury to his reputation and career, emotional distress, and humiliation. *Id.* ¶ 37.

■ Although there are jurisdictions which recognize a cause of action for self-defamation, the District of Columbia is not one of those jurisdictions. *See Atkins v. Industrial Telecommunications Assoc., Inc.*, 660 A.2d 885, 886 (D.C.1995) (although decision expressly applied Virginia law, District of Columbia Court of Appeals let stand the trial court's conclusion that "neither the District of Columbia nor Vir-

ginia law recognized a cause of action for defamation based on compelled self-publication" of allegedly defamatory information contained in Atkins' termination letter). The parties do not cite, nor has the Court identified, any authority which either suggests or affirmatively states that self-defamation is a cause of action recognized in the District of Columbia.[9] Accordingly, the Court will grant summary judgment on plaintiff's self-defamation claim.

### III. Conclusion

For the reasons stated herein, the Court will deny summary judgment on plaintiff's breach of contract claim, and will grant defendant summary judgment on plaintiff's self-defamation claim.[10]

### *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, on this 2nd day of May 2003, it is hereby

ORDERED that defendant Howard University's Motion for Summary Judgment [Dkt. # 48] is GRANTED IN PART with respect to the claim for self-defamation, and it is

FURTHER ORDERED that defendant Howard University's Motion for Summary Judgment [Dkt. # 48] is DENIED IN PART with respect to the claim for breach of contract, and it is

FURTHER ORDERED that the Joint Motion for Postponement of Pretrial Conference and Extension of Deadlines prior to Pretrial Conference [Dkt. # 57] is GRANTED, and it is

FURTHER ORDERED that the pretrial conference shall be held on **July 1, 2003** at 9:30 a.m. in Chambers 2321 of the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, DC 20001. The parties are reminded that deadlines for submission of a joint pretrial statement and motions *in limine* are set forth in the Court's February 11, 2003 Order for Pretrial Conference. Dates for jury selection and for trial will be set at the pretrial conference.

SO ORDERED.

9. Plaintiff argues that *Atkins* is not controlling because the court there merely was interpreting Virginia law, and not the law of the District of Columbia. However, it is not disputed by plaintiff that the tort of self-defamation has not been adopted in this jurisdiction. While the *Atkins* court was concerned only with whether the tort would be recognized in Virginia, the court stated that one of its reasons for concluding that Virginia courts would not do so was its agreement with "the hesitancy and restraint [exercised] by the *Yeitrakis [v. Schering–Plough Corp.*, 804 F.Supp. 238, 250 (D.N.M.1992) ] court (a federal district court interpreting New Mexico's law)[.]" *Atkins*, 660 A.2d at 895, when it was confronted with the identical situation.

   Exercising that same "hesitancy and restraint" employed by the District of Columbia Court of Appeals, this Court is compelled to conclude that:

[t]here simply is not the historical and judicial context at this time to predict ... that the [District of Columbia] Court of [Appeals] would adopt th[e] tort of self-[publication] as the law of ... [the District of Columbia] .... *Unless the judicial landmarks are so clearly evident as to point in a single direction on that subject,* this court should not presume upon functions of the [District of Columbia] Court of [Appeals] with regard to the proper development of the common law in ... [the District of Columbia].

*Id.* (emphasis and bracketed language in original). The state of the law in this jurisdiction does not permit this Court to do anything other than what the court in *Atkins* also refused to do.

10. An Order consistent with this Memorandum Opinion is issued separately.